IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JEFFREY ALAN WILLIAMSON,          §
                                  §
          Plaintiff,              §
                                  §
VS.                               §    CIVIL ACTION H-07-3776
                                  §
AMERICAN NATIONAL INSURANCE       §
COMPANY,                          §
                                  §
          Defendant.              §

**OPINION AND ORDER**

Pending before the Court in the above referenced cause alleging employment discrimination based on disability and retaliation under both state and federal law[1] and seeking to recover compensatory and punitive damages and to obtain injunctive

---

[1] *Pro se* Plaintiff Jeffrey Alan Williamson's Amended Complaint (#65 and 74) is vague, conclusory, and spare, with limited factual allegations.  In light of his alleged disability, the Court has made its best effort to construe it, supplementing its factual allegations with his representations in the summary judgment evidence (Plaintiff's deposition, answers to interrogatories and requests for admission, and his grievances filed with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC")).

The pleading asserts violations of the following statutes: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; The Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code, § 21.051, *et seq.*; The Americans With Disabilities Act ("ADA"), as amended in 2008, 42 U.S.C. § 12101, *et seq.*; and Section 501 of the Rehabilitation Act of 1973.  Plaintiff also alleges common-law negligence ("breach of the duty of an employer" and "breach of the negligence of an employer") and intentional infliction of emotional distress ("IIED").

-1-

relief, are Defendant American National Insurance Company's ("ANICO's") (1) motion to dismiss and motion for more definite statement (instrument #67) and (2) motion for summary judgment (instrument #90). At this stage of the litigation, the Court chooses to address the motion for summary judgment.

### Allegations in Plaintiff's Amended Complaint (#65, 74)

*Pro se* Plaintiff Jeffrey Alan Williamson, at the time of his dismissal a Programmer Analyst, had been employed by ANICO since April 5, 1999 as a programmer in the Systems Planning and Computing ("SP&C") department. With supporting evidence, he claims that his job performance at all times was more than satisfactory (with "full performance" ratings) and that he received an annual increase in salary until he was discharged on January 31, 2006.

Williamson explains that he has suffered recurring "seizures and impairments"[2] from approximately May 2004 up to the present. He did not have an annual review in 2004 because on May 23rd of that year he collapsed from an apparent stroke and had surgery at the University of Texas Medical Branch on the cognitive side of his brain because of an intra cranial hemorrhage, seizure, stroke, and coma. The surgery was followed by a period of rehabilitation at the Transitional Learning Center in Galveston, Texas from June 14– August 10, 2004. He returned to work on September 13, 2004.

---

[2] ANICO complains that Williamson never explains what "impairments" he suffered other than seizures.

Plaintiff claims disability discrimination, from the date of his stroke, by all individual ANICO employees involved in certain specific acts that he details.  First he claims intentional infliction of emotional distress as well as discrimination when ANICO "forced" him to transfer from Galveston to the new data center in League City in January 2005.  He claims it put him in an environment that was more damaging, more stressful, with more responsibilities, all of which aggravated his condition.

He also charges that, despite his continuing "seizures and impairments," his direct supervisor, Alec Mendez, and Human Resources designated him to be the floor captain of the third floor of the new data center, which entailed providing first aid and evacuating employees in "dangerous circumstances."  He objected to the required training that Human Resources made him take to learn first aid to keep people alive.  He charges generally that ANICO "showed a lack of care concerning what I suffered, what I went through, that I continued to suffer during employment and I continue to suffer this day."  #90, Ex. 15, at 419:14-16.

Plaintiff claims that he was "harassed" by various individual ANICO employees during his rehabilitation because of his disability before and after he was "forced to transfer from Galveston, Texas to League City, Texas."[3]   According to the amended complaint,

_____

[3] ANICO, a life and health insurance company domiciled in Texas, responds that many of its subsidiaries are located at two sites, one in Galveston and the other in League City, about thirty

after Plaintiff's stroke, surgery, and period of rehabilitation, and despite continuing "seizures and impairments," Mendez assigned Plaintiff even more responsibilities than before his injury and rehabilitation.  He also inflicted emotional distress on Plaintiff by making him take vacation time instead of sick leave when he had to recover from seizures or go for treatment, tests, or doctor's appointments.   During his deposition Plaintiff identifies his request for sick leave as a request for reasonable accommodation. Mendez was also "associated with" Plaintiff's transfer to League City.  Mendez allegedly harassed Williamson for errors Plaintiff made.

Plaintiff claims that Don Ciaccio was his supervisor during Plaintiff's rehabilitation at the Transitional Learning Center and produces a document stating such, but there is some uncertainty about that allegation.[4]  Ciaccio drove Defendant's corporate van

---

miles away. The League City facility is newer and over the past few years ANICO has moved a number of departments from Galveston to League City.   Although Williamson was originally assigned to Galveston, after a new computer center was built in League City, the positions held by Williamson and his department co-workers were all moved to League City.

[4]    ANICO denies it.  During his deposition Plaintiff at one point when asked if Ciaccio "wasn't in fact your supervisor while you were undergoing rehabilitation," Plaintiff answered, "No, he was stated by the Transitional Learning Center, but yet not to my knowledge, nor did he ever act as my supervisor during rehabilitation even though he was stated to be such."  #90, Ex. 15 at 412:17-22.  *But see id.* at 418 (Ciaccio did supervise "as stated by the Transitional Training Center.").  Because under Rule 56 the Court must draw all reasonable inferences in favor of the non-movant, because Williamson has a document indicating Ciaccio was

pool, which transported employees who lived in Galveston back and forth to work. Plaintiff complains that he had a seizure in December 2005 during one of these trips, and that Ciaccio did not call EMS but dropped off the "healthy employees" in League City, then continued to drive with Plaintiff on the floor of the van, while Plaintiff had recurring "seizures and impairments," and finally had him escorted out of the van because Plaintiff could not walk by himself. Plaintiff also complains about Ciaccio's regular "negative" comments and states Plaintiff was embarrassed when he overheard Ciaccio talking about his seizure. Don Ciaccio also harassed him by telling him Defendants were about to lay off employees and that reasons were being collected to "get rid of" Williamson.

Plaintiff also complains about the Human Resources department and Jason Broussard. Claiming that Plaintiff was subjected to a hostile work environment and suffered severe emotional distress, which could cause more seizures, Williamson alleges that despite his recurring seizures and impairments, he was harassed by Mendez and Broussard to be trained as a floor captain, able to provide first aid and to evacuate employees during "dangerous circumstances."

---

Plaintiff's supervisor at the Transitional Learning Center, and because Plaintiff's deposition testimony is confusing and ambiguous, the Court assumes for purposes of the summary judgment that Ciaccio was a supervisor during Plaintiff's rehabilitation at this stage of litigation.

Plaintiff names Sarah Sparks, who stated that she was "taking care of Jeffrey's personal affairs."[5]  Williamson also claimed that

---

[5] The accusations against Sarah Sparks (sometimes denoted "S.S.")in the amended complaint and summary judgment evidence are few, unclear and do not appear to be materially related to Plaintiff's alleged employment discrimination based on his disability at ANICO other than the fact that she was at times employed by ANICO.  The most comprehensive allegations are found in Ex. U at 12 [*sic*], Plaintiff's Response to Defendant's First Set of Interrogatories, attached to Plaintiff's response to the motion for summary judgment (#91):

> Employee of the Defendant named Sarah Sparks harassed the Plaintiff to include other employees of the Defendant for they never had relations with each other prior to Plaintiff's intra cranial, hemorrhage, seizure, stroke, coma(s), etc.  S.S. of Defendant told employees of the Defendant, "they" were getting married, she's pregnant, etc.  S.S. harassed and took full advantage of the Plaintiff, to include stealing money out of his checking account when he wasn't even in the state of Texas, prior to returning to work for the Defendant during August or September of 2004 (Plaintiff spent time with his mother in Utah, before returning to work).  S.S. harassed Plaintiff, to include Plaintiff's mother to use the Plaintiff's truck for transportation.  Prior, during and after Sarah Sparks' employment with ANICO, she worked for other employers as well.  Plaintiff, had to aid Sarah Sparks regardless of his rehabilitation due to Sarah's employment and actions at other employers.  S.S.'s harassment of the Plaintiff to the point that 3-5 officers/detectives had to break into the Plaintiff's apartment, to arrest S.S. on ONE occasion for $20,000.00 worth of theft during her employment with the Defendant.  S.S. as well harassed the Plaintiff throughout his rehabilitation at the T.L.C., and after, for she was a stripper at multiple "clubs" inside and outside of Galveston County.  S.S.'s relations to multiple individuals due to her employment in the area stated above was harassing and negligent to Plaintiff, during rehabilitation and after rehabilitation, when the Plaintiff returned to working for the Defendant.  Due to all harassment, and actions of S.S. of the Defendant, S.S.'s parents had to take over full custody of S.S.'s daughter named Emma.

he was harassed by ANICO's Medical Director, the Human Resources Department, and the management team in the Computing Division who were privy to "his medical status, doctor's reports, doctor's releases, etc." He claims that ANICO, as his employer, had a duty to supervise him and other employees and to prevent unlawful conduct that could damage him, but that ANICO breached that duty. He charges that ANICO was negligent in supervising and training, and in transferring him from Galveston to League City despite his recurring "seizures and impairments," in making him a floor captain, and in requiring him to be trained and certified in first aid for evacuation of employees at dangerous times.

Plaintiff claims he was terminated by ANICO, specifically by Senior Executive Vice President and Chief Administrative Officer James Pozzi[6] and Assistant Vice President of Human Resources Carol Ann Kratz, on January 31, 2006. Plaintiff's Supplemental to his Amended Complaint (#72) seeks to add as parties James Pozzi, Sarah Sparks, Don Ciaccio, Alec Mendez and Carol Ann Kratz.[7]       During

---

[6] When questioned during his deposition about his complaint against Pozzi, Plaintiff could only state that Pozzi was his boss, Pozzi "was responsible for the system" and "above everybody else," Pozzi was "associated with terminating me," and "he should have been more considerate with all I went through." #90, Ex. 15-A at 36-62. He stated that he had no conversations with Pozzi about requesting accommodation. *Id.* at 364:2-8.

[7] Only an "employer" can be liable under Title VII. Title VII defines "employer" a "a person engaged in an industry affecting commerce . . . and any agent of such a person." 42 U.S.C. § 2000e(b). Liberally construing "any agent," the Fifth Circuit has held immediate supervisors to be employers under the statute "when

his deposition, Plaintiff testified that Kratz harassed him in two ways because, although she was aware of his medical condition, she (1) had him transferred to League City and (2) required him to train as floor captain to provide first aid to employees and to evacuate them in dangerous situations.   Ex. 15-A at 358:2-17. Broussard "works right underneath Ms. Kratz." *Id.* at 359, l.7. Williamson also charges that Sarah Sparks, Don Ciaccio, Alec Mendez, Carol Ann Kratz, James Pozzi, and other ANICO employees acted with malice, lack of care, lack of duty, and reckless disregard of Plaintiff's rights and welfare.  He claims that in the employer-employee relationship, and as an insurance policyholder, Plaintiff was owed by ANICO a duty to prevent injury and to aid him

---

delegated the employer's traditional rights, such as hiring and firing" or if the supervisor "'participated in the decisionmaking process that forms the basis of the discrimination.'"  *Harvey v. Blake*, 913 F.2d 226, 227 (5th Cir. 1990); *Hamilton v. Rodgers*, 791 F.2d 429, 442-43 (5th Cir. 1986), *quoting Jones v. Metro. Denver Sewage Disposal Dist.*, 537 F. Supp. 966, 970 (D. Colo. 1982).  A court should also examine whether the supervisor was responsible for the terms and conditions of the plaintiff's employment or for the plaintiff's work assignment in the company.  *Garcia v. Elf Atochem North America*, 28 F.3d 446, 451 (5th Cir, 1994), *abrogated in part by Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)(holding that same-sex sexual discrimination is actionable under Title VII).  The purpose of the "agent" provision in § 2000e(b) was to incorporate *respondeat superior* liability into Title VII.  *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.), *cert. denied*, 513 U.S. 1015 (1994).  Nevertheless a supervisor or employee cannot be held liable in his individual capacity, only in his official capacity as an agent of the employer.  *Id. at* 652-53. Similarly, a supervisor cannot be held personally liable under the ADA, which has a mirror "employer" provision.  *See, e.g., Jenkins v. Bd. of Educ.*, 937 F. Supp. 608, 612 (S.D. Tex. 1996); *Miller v. Giglio Distrib. Co.*, 899 F. Supp. 318, 319 (E.D. Tex. 1995).

during his recurring seizures and impairments.

Plaintiff conclusorily asserts that he was "harassed to the point that he, and other employees of the Defendant were subject to a hostile work environment and that he was discharged because of his disability."  #65, ¶ 34.

Plaintiff alleges that he filed a timely Charge of Disability Discrimination with the Equal Employment Opportunity Commission. Plaintiff received a Dismissal Notice of Right to Sue letter dated August 17, 2007 stating that the EEOC was unable to conclude that his charge established violations of the relevant statutes.

The Social Security Administration found that Williamson was "disabled" on the day he was terminated, January 31, 2006, and provided disability benefits retroactively to that date.

ANICO's conduct purportedly caused Williamson humiliation, emotional distress, mental and physical pain and suffering, damage to his personal reputation, need for medical services and medications in the past and in the future, damage to his earning capacity, and damage to recurring seizures and impairments that he might suffer for the rest of his life.

Plaintiff claims that threats of lay offs and the hostile work environment caused him severe emotional distress.  He also maintains that ANICO breached its duty as his employer to supervise him and other employees and to prevent or correct unlawful conduct by employees in the workplace and, apparently, during his seizures.

Plaintiff also charges ANICO with negligence in forcing his transfer to Galveston in spite of his recurring seizures and impairments.

Plaintiff also, without providing any supporting facts, alleges retaliation in violation of Title VII and violation of 42 U.S.C. § 1981.

In his "Supplemental" to his Amended Complaint (#74 at ¶¶ 5-7) Plaintiff states that six other employees were also terminated by Defendant, but names only Pete Haswell, who died of cancer shortly after his termination, and Gordon Hughes, who was re-hired in a different position.  In his response to the motion for summary judgment (#91 at 15), Plaintiff emphasizes that he and Haswell both had a "health related issue" and were both terminated.

## Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has the burden to demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 317, 323 (1986). The substantive law governing the claims identifies the essential elements and thus indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 325 (1986).

Where the non-movant bears the burden of proof at trial, the movant need only point to the absence of evidence to support an essential element of the non-movant's case; the movant does not have to support its motion with evidence negating the non-movant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant succeeds, the non-movant must come forward with evidence such that a reasonable party could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant "must come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A factual dispute is deemed 'genuine' if a reasonable juror could return a verdict for the nonmovant, and a fact is considered 'material' if it might affect the outcome of the litigation under the governing substantive law." *Cross v. Cummins Engine Co.*, 993 F.2d 112, 114 (5th Cir. 1993). Summary judgment is proper if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322-23; *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006). Although the court draws all reasonable inferences in favor of the non-movant, the non-movant "cannot defeat summary judgment with conclusory, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Center*,

-11-

476 F.3d 337, 343 (5th Cir. 2007).   Conjecture, conclusory allegations, unsubstantiated assertions and speculation are not adequate to satisfy the nonmovant's burden.   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994); *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).   "'[A] subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief.'"   *Lawrence v. Univ. of Texas Medical Branch*, 163 F.3d 309, 313 (5th Cir. 1999), *quoting Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983).   Nor are pleadings competent summary judgment evidence.   *Little,* 37 F.3d at 1075.

A district court may not make credibility determinations or weigh evidence when deciding a summary judgment motion.   *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009), *citing EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999).   Nor does the court have to sift through the record in search of evidence to support opposition to summary judgment.   *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## Relevant Law

### *Plaintiff's Pro Se Status*

The district court is to construe liberally the briefs of *pro se* litigants and apply less stringent standards to them than to parties represented by counsel.   *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006); *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995).   Nevertheless, a *pro se* party must still brief his issues.

*Grant v. Cuellar*, 59 F.3d at 524; *see also Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993)("'Although [this Court] liberally construe[s] the briefs of pro se appellants, we also require that arguments must be briefed to be preserved.'"), *quoting Price v. Digital Equip. Corp.*, 846 F.2d 1026, 1028 (5th Cir. 1988). "[L]itigants, even if *pro se*, cannot oppose motions for summary judgment with unsworn statements." *Wilson v. Stalder*, 70 F.3d 1268,

**Statutes Inapplicable As a Matter of Law**

Initially the Court would point out those statutes cited by Plaintiff under which he, as a matter of law, has no claim. As evidenced by his complaint, the boxes he checked and the facts he alleged in his EEOC and TWC grievances, and his deposition (#90, Exs. 15-A and 15-B), the sole basis of his discrimination claims is disability.

*Section 1981*

Title 42 U.S.C. § 1981 applies only to race-based discrimination. *Ingram v. Papa John's Intern., Inc.*, 171 Fed. Appx. 439, 441 (5th Cir. 2006)("Race . . . is the only protected class under § 1981."), *citing inter alia Burditt v. Geneva Capital, LLC*, 161 Fed. Appx. 384, 385 (5th Cir. 2006)(*per curiam*)("Because Burditt has not alleged racial discrimination, he has not stated a claim . . . under § 1981.").

Perhaps Plaintiff meant § 1981a(a), a 1991 amendment to §

1981, which provides a prevailing plaintiff in an intentional employment discrimination suit (whether brought under Title VII, the ADA or the Rehabilitation Act[8]) with the ability to recover compensatory and punitive damages.  Section 1981a does not create a new substantive right nor an independent cause of action; instead it "'enhances the remedies otherwise available for intentional employment discrimination..'" *Yowman v. Jefferson County Community Supervision & Corrections Dept.*, 370 F. Supp. 2d 568, 585-86 (E.D Tex. 2005), citing *Huckabay v. Moore*, 142 F.3d 233, 241 (1998); and *Perry v. Dallas Indep. Sch. Dist.*, No. Civ. A. 3:96cv2855D, 1998 WL 614668, *1 n.1 (N.D. Tex. Sept. 2, 1998); and *Swartzbaugh v. State Farm Ins. Cos.*, 924 F. Supp. 932, 934 (E.D. Mo. 1995).  "[I]t applies only if the plaintiff otherwise establishes intentional discrimination on the part of the employer under another substantive act"; there must be a claim under another substantive act for it to apply.). *Yowman*, 370 F. Supp. 2d at 586, *citing Huckabay*, 142 F.3d at 241.

*Title VII*

Plaintiff's disability discrimination claim does not fall within the purview of Title VII's protected classes.  Under section 703(a) of Title VII, it is "an unlawful employment action for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual

_____

[8] 42 U.S.C. § 1981a(a)(2).

with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff made clear during his deposition that he is not alleging discrimination based on his Apache background.[9]

*Section 501 of The Rehabilitation Act of 1973*

The Rehabilitation Act, 29 U.S.C. § 794(a), prohibits discrimination against an otherwise qualified individual with a disability in programs that receive federal funding. *Handy v. Brownlee*, 118 Fed. Appx. 850, 854 (5th Cir. 2004). Plaintiff has neither alleged nor shown that ANICO is a federal employer or that it received federal funds for Plaintiff's employment, necessary to establish a *prima facie* case under the statute. *Id.* ("To establish a claim under the Rehabilitation Act, a plaintiff must show that he: (1) is an individual with a disability; (2) is otherwise qualified to perform the job; (3) was employed in a program or activity that receives federal funding; and (4) was discriminated against solely because of his disability."), *citing Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997). Nevertheless, pursuant to Section 501(g), 29 U.S.C. § 791(g),[10] the standards for

_____

[9] See #90, Ex. 15, at 385-88 (stating he has no knowledge that anything that anybody said to him made him believe they were treating him differently because of his Native American heritage).

[10] Section 791(g) provides, "The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section

-15-

determining a violation of the Rehabilitation Act, as amended in 1992, are the same as those for a violation of the ADA, under which Plaintiff may have a cause of action. *See* 42 U.S.C. § 94(d) and 42 U.S.C. § 12101, *et seq.; Pinkerton v. Spellings*, 529 F.3d 513, 516-17 (5th Cir. 2008).

*2008 Amendments to the ADA*

Plaintiff cites to the 2008 amendments to the ADA, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  In September 2008, Congress enacted the Americans with Disabilities Act Amendment of 2008, effective as of January 1, 2009. Pub. L. 110-325, 122 Stat. 3553, 3554 (2008), "to restore the intent and protections of the Americans with Disabilities Act of 1990," narrowed by the Supreme Court.  It expanded the class of individuals to be protected under the definition of "disability."   It also overturned *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999)(holding that under subpart (A), to limit the  major life activity of  working a plaintiff had to show that she was regarded as having an impairment that substantially limited her life activity of working in the same "broad class of jobs"), and *Toyota Motor*'s narrow, exacting definition of "substantially limits," i.e., "considerable" or "to a large degree" so as to "preclude impairments that interfere in only a minor way with the performance of manual tasks from

_____

shall be the standards applied under . . . the Americans with Disabilities Act . . . ."

-16-

qualifying as disabilities." 534 U.S. at 196-97. Section 3(3)(B) of the 2008 Amendments states that it "shall not apply to impairments that are transitory and minor," i.e., an "impairment with an actual or expected duration of 6 months or less." Section 3(D) further states, "An impairment that is episodic or in remission is a disability if it would substantially limit a major activity when active."

Plaintiff filed his complaint in 2007. The Amendments expressly did not go into effect until January 2009. Those courts that have addressed and answered the question of the retroactive application of the Act have concluded it does not apply retroactively. *See, e.g.,* appellate court decisions in *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n. 8 (5th Cir. 2009)(ADA Amendments Act of 2008's "changes do not apply retroactively"), *citing Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994)("Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear."); *Lytes v. DC Water and Sewer Authority*, 572 F.3d 936, 939-40 (D.C. Cir. 2009)("By delaying the effective date of the ADA, the Congress clearly indicated the statute would apply only from January 1, 2009."); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-67 (6th Cir. 2009)(The ADA Amendments Act of 2008 "does not

apply to govern conduct occurring before the Act became effective";
*Thornton v. UPS, Inc.*, ___ F.3d ___, No. 08-2162, 2009 WL 3766264,
*6 n.3 (1st Cir. Nov. 12, 2009)(*citing Milholland*).

### Applicable Law

*ADA, 42 U.S.C. §§ 12101, et seq.*

Plaintiff has alleged several claims under the ADA:
discriminatory termination (disparate treatment); failure to
accommodate Plaintiff's disability; hostile work environment; and
retaliation.

An employee asserting a claim under the ADA must exhaust
administrative remedies before commencing an action in federal
court against his employer. *Dao v. Auchan Hypermarket*, 96 F.3d
787, 788-89 (5th Cir. 1996). Failure to exhaust remedies results
in dismissal of claims on the merits. *Id.* The ADA incorporates by
reference the procedures for exhaustion applicable to claims under
Title VII. *Wesley v. Dallas ISD*, No. 03-08-CV-2025-K, 2009 WL
193786, *2 (N.D. Tex. Jan. 27, 2009). Specifically a plaintiff
must file a claim with the EEOC within 180 days of the unlawful act
or, if he has filed a complaint with a state or local agency,
within 300 days. *Ikossi-Anastasiou v. Board of Supervisors of La.
State Univ.*, 579 F.3d 546, 549 (5th Cir. 2009); *EEOC v. WC&M
Enterprises, Inc.*, 496 F.3d 393, 398 (5th Cir. 2007), *citing* 42
U.S.C. § 2000e-5(e)(1). After the plaintiff receives a "right-to-
sue" letter from the EEOC or the state agency, he must commence an

-18-

action in district court within 90 days.   42 U.S.C. § 2000e-5(f)(1); *Nilsen v. City of Moss Point, Miss.*, 621 F.2d 117, 120 (5th Cir. 1980).

An ADA action is limited in scope to the scope of the plaintiff's administrative charge and to the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination.   *Pachego v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006); *Wesley*, 2009 WL 193786, *2.   In *Pachego v. Mineta*, 448 F.3d at 789, the Fifth Circuit reasoned,

> On the one hand, because the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally.   On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in an attempt to achieve non-judicial resolution of employment discrimination claims.   Indeed, a less exacting rule would also circumvent the statutory scheme since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance . . . .  [A]llowing a federal complaint to proceed despite its loose "fit" with the administrative charge and investigation is precluded if it would circumvent agency efforts to secure voluntary compliance before a civil action is instituted.

*Id.*, *citing Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463 (5th Cir. 1970).

The relevant portion of the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees,

-19-

employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a).

In addition, Section 12112(b)(5) states that the term, "discriminate," includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . .  unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of the business of such covered entity."  Because the ADA mandates that employers reasonably accommodate the limitations caused by the disability and not the disability itself, an employee asserting a disability discrimination clam must produce evidence that the employer not only knew of the employee's disability, but also of the physical and mental limitations arising from it.  *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999).

A plaintiff may establish a claim of discrimination under the ADA by presenting direct evidence or by using the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Seaman*, 179 F.3d at 300.

"Direct evidence proves intentional discrimination without inference or presumption when believed by the trier of fact.  *Jones v. Overnite Transportation Co.*, 212 Fed. Appx. 268, 272 (5th Cir. 2006), *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "In the context of Title VII [and the ADA], direct evidence includes any statement or written document showing a

-20-

discriminatory motive on its face." *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 195 (5th Cir. 2001), *citing Portis v. National Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir, 1994); *Overnite Transportation*, 212 Fed. Appx. at 272.   If a plaintiff produces direct evidence of discrimination, he may "bypass the *McDonnell Douglas* burden-shifting framework [discussed *infra*] commonly applied in discrimination cases and proceed directly to the question of liability." *Moore v. U.S. Dept. of Agric.*, 55 F.3d 991, 995 (5th Cir. 1995); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001); *Stone v. Parish of East Baton Rouge*, No. 08-31008, 2009 WL 2169122, *2 (5th Cir. July 20, 2009).   "In such 'direct evidence' cases, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Fierros*, 274 F.3d at 192, *quoting Brown v. East Miss. Elec. Power Assoc.*, 989 F.2d 858, 861 (5th Cir. 1993).

"Workplace remarks may constitute direct evidence of discrimination if they are '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue[11]; and 4) related to the employment decision at issue.'" *Brown v. CSC*

---

[11] Or someone in the position to influence an employment decision.  *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003)(*per curiam*).

*Logic, Inc.*, 82 F.3d 651, 655 (5ᵗʰ Cir. 1996); *Patel v. Midland Memorial Hospital & Medical Center*, 298 F.3d 333, 343-44 (5ᵗʰ Cir. 2002), *quoting Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222-23 (5ᵗʰ Cir. 2001).[12]  *See also Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5ᵗʰ Cir. 2000), *cert. denied*, 532 U.S. 937 (2001).  If the comments fail to meet these criteria, e.g., if they are vague and remote in time, or the speaker has no authority or influence over the employment decisions, they are merely "stray remarks." *See, e.g., Krystek v. University of Southern Miss.*, 164 F.3d 251, 256 (5ᵗʰ Cir. 1999).  After the issuance of *Reeves*, the Fifth Circuit has continued to find that remarks may be "probative of discriminatory intent" and "are appropriately taken into account

---

[12] In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), *reversing  Reeves v. Sanderson Plumbing Prods., Inc.*, 197 F.3d 688 (5ᵗʰ Cir. 1999), the Supreme Court declined to use this four-prong test from *CSC Logic* employed below by the Fifth Circuit where remarks were submitted as additional evidence of discriminatory animus in the last stage of the *McDonnell Douglas* framework.  Denying summary judgment, the Fifth Circuit *inter alia* discounted these remarks because they "were not made in the direct context of Reeves's termination."  197 F.3d at 693, *reversed*, 530 U.S. 133.  The Fifth Circuit has continued to apply this four prong test from *CSC Logic* "when the remark is presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework."  *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 n.4 (5ᵗʰ Cir. 2001), *citing Augster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 404-05 (5ᵗʰ Cir. 2001)(noting that the Fifth Circuit has determined that *Reeves* did not overrule the Fifth Circuit's "stray remarks jurisprudence, at least where the plaintiff has failed to produce substantial evidence that each of the defendant's articulated justifications was pretext."), *citing Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5ᵗʰ Cir. 2000)(applying the stray remarks doctrine where the plaintiff has failed to establish that each of defendant's articulated justifications was pretext), *cert. denied*, 532 U.S. 937 (2001).

when analyzing the evidence . . . even where the comment is not in the direct context of termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision." *Palasota*, 342 F.3d at 578, *cited in Cervantez v. KMGP Services Co., Inc.*, No. 08-11196, 2009 WL 2957297, *4 & nn.22-27 (5th Cir. Sept. 16, 2009); *see also Brauninger v. Motes*, 260 Fed. Appx. 634, 640 (5th Cir. 2007)(to be evidence of animus, a remark must be related to and in proximate time to a specific employment decision and the remark must be "direct and unambiguous."). Remarks reflecting discriminatory animus may be used to demonstrate pretext or as additional evidence of discrimination. *Russell, 235 F.3d at 225.* Where the remarks are the *only* evidence of pretext, however, they are not probative. *Palasota*, 342 F.3d at 577.

Under the *McDonnell Douglas* framework applied to circumstantial evidence cases, a plaintiff must first make a *prima facie* case of an ADA violation by establishing that (1) he has a "disability"; (2) he is "qualified" for his position; (3) he suffered an adverse employment action because of his disability or the perception of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *Chevron Phillips*, 570 F.3d at 615. "[W]here the disability, resulting limitations, and necessary reasonable accommodation are not open, obvious and apparent to the employer, the initial burden rests

primarily upon the employee to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Id.* at 621, *citing Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996).

The burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Chevron Phillips*, 570 F.3d at 615. If the employer meets this burden, the framework falls away and the issue becomes discrimination *vel non. Id.* The plaintiff must then offer sufficient evidence to raise a genuine issue of material fact as to whether each articulated reason is a mere pretext for discrimination, or show that the defendant's reason for the decision, while true, is only one reason for its conduct and another motivating factor is plaintiff's protected characteristic.[13] *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

For a *prima facie* case of disparate treatment disability discrimination, the second (was qualified for his job) and third (suffered an adverse employment action) prongs are not at issue here. For the first prong, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of

---

[13] The Fifth Circuit calls this the "modified *McDonnell Douglas*" approach. *Rachid*, 376 F.3d at 312.

such impairment; or (C) being regarded as having such an impairment."[14]   To state a claim under subsection A, a plaintiff must allege that he has a physical or mental impairment.   § 12102(2)(A); 29 C.F.R. § 1630.2(g).   A "physical impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:   neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine."  29 C.F.R. § 1630.2(h)(1).   A "major life activity" is "substantially limited" when the individual is "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner, or duration under which the average person can perform the same major life activity."  *McInnis v. Alamo Community College Dist.*, 207 F.3d 280 (5th Cir. 2000), *quoting* 29

_____

[14] Courts look to two possible authorities for interpreting the terms of § 12101:  the regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U.S.C. § 706(8)(B)(1988), and the EEOC regulations construing the ADA.   *EEOC v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 614 n.4 (5th Cir. 2009), *citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002).  The Rehabilitation Act is a precursor to the ADA on which Congress relied in drafting the ADA and about which Congress specified, "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under Title V of The Rehabilitation Act of 1973 (29 U.S.C. §§ 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title."  *Chevron Phillips*, 570 F.3d at 614 n.5.

C.F.R. § 1630.2.

Simply having an impairment is insufficient to make one "disabled" under the statute; a plaintiff must also show that the impairment substantially limits a major life activity. *Chevron Phillips,* 570 F.3d at 614, *citing Toyota Motor*, 534 U.S. at 195. Moreover a plaintiff must have more than a diagnosis of an impairment to prove he has a disability under the statute; those "claiming the act's protection" must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience . . . is substantial." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). *See also Toyota Motor*, 534 U.S. at 198 ("an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's lives. The impairment impact must also be permanent or long term."). An "impairment" does not include "'transitory illnesses which have no permanent effect on the person's health.'" *de la Torres v. Bolger*, 781 F.2d 1134, 1137 (5th Cir. 1986), *citing Stevens v. Stubbs*, 576 F. Supp. 1409, 1414 (N.D. Ga. 1983). *See also Evans v. City of Dallas*, 861 F.2d 846, 852 (5th Cir. 1988)(the Act "contemplates an impairment of a continuing nature."); *Van Zande v. Wisconsin Dep't. of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995)(Intermittent, episodic impairments are not disabilities), *citing* 29 C.F.R. pt. 1630 app., § 1620.2j ("[T]emporary, non-chronic impairments of short duration, with

little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza."). When the major life time activity is working, a physical or mental impairment that only affects the plaintiff's ability to engage in a narrow range of jobs or a particular job alone does not "substantially limit one or more major life activities." *Carter v. Ridge*, 255 Fed. Appx. 826, 829 (5th Cir. 2007), *citing Hileman v. City of Dallas*, 115 F.3d 352, 353–54 (5th Cir. 1997)("the impairment must substantially limit employment generally"), and *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999)("To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice.").

The implementing regulations in § 1630.2(i) provide a non-exhaustive list of major life activities, which include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *id*. Moreover, "to be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform or to be significantly restricted in the ability to perform it." *Id.*, *citing* 29 C.F.R. § 1630.2(j). In deciding whether a person is "substantially limited" in a major life activity, the EEOC advises that courts should

-27-

consider:  '(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'"  *Id.* at 614-15, *citing* 29 C.F.R. § 1630.2(j).  "[W]hether an individual is disabled under the ADA . . . remains an individualized inquiry."  *Chevron Phillips*, 570 F.3d at 620.


Having a "record" of having a substantially limiting impairment under 42 U.S.C. § 12102(2)(B) is defined by 29. C.F.R. § 1630.2(k):  "*Has a record of such impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 192 (5th Cir. 1996).

To be "regarded as" disabled under the ADA, 42 U.S.C. § 12101(2)(c), a plaintiff must

> (1) ha[ve] an impairment which is not substantially limiting but which the employer perceives as substantially limiting . . . ; (2) ha[ve] an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) ha[ve] no impairment at all but is regarded by the employer as having a substantially limiting impairment.

*Crawford*, 245 Fed. Appx. at 380, *citing Rodriguez v. ConAgra Grocery Prods.*, 436 F.3d 468, 475 (5th Cir. 2006).

For the second prong of a *prima facie* case of disability

-28-

discrimination, a "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8). To determine whether the plaintiff is "otherwise qualified" for the job, the court must first decide whether the plaintiff can perform the core functions of the job; if not, the court must determine whether a reasonable accommodation would enable the employee to do so. *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1983), *cert. denied*, 511 U.S. 1011 (1994). A covered employer must provide reasonable accommodations to an "otherwise qualified" person with a disability unless the employer can show that the accommodation "would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). The plaintiff bears the burden of requesting reasonable accommodations. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

A reduction in force ("RIF") "is itself a legitimate, nondiscriminatory reason for discharge." *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)(in Title VII action); *see also Russo v. Smith Intern.*, 93 S.W. 3d 428, 438 (Tex. App.--Houston [14th Dist.] 2002, pet. denied)(in context of Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code § 21.051). To present a *prima facie* case of discrimination in an RIF case, a plaintiff must demonstrate (1) that he is within a

-29-

protected group; (2) that he was adversely affected by the employer's decision; (3) that he was qualified to assume another position; and (4) he must present evidence from which the factfinder might reasonably conclude that the employer intended to discriminate on the basis of his protected status in making that decision. *Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 832 (S.D. Tex. 2009), *citing Thomas v. Exxon, U.S.A.,* 943 F. Supp. 751, 759 (S.D. Tex. 1996), and *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).  The plaintiff has to make only a minimal showing to establish such a *prima facie* case.  *Lohn*, 652 F. Supp. 2d at 832, *citing Nichols*, 81 F.3d at 41.

The modified *McDonnell Douglas* framework of shifting burden of proof applies to such claims based on circumstantial evidence: if plaintiff makes a *prima facie* case of discrimination, a presumption of discrimination arises; defendant then must articulate a legitimate nondiscriminatory reason for its employment action, which burden is met if it produces  evidence that "*taken as true* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action"; if the defendant succeeds, the presumption of discrimination drops out, and the plaintiff must introduce evidence creating a jury questions as to whether the defendant was motivated by discriminatory animus either by showing (1) the defendant's articulated reason was pretextual or (2) plaintiff's protected characteristic was a motivating factor in the

-30-

decision (mixed motives alternative). *Lohn*, 652 F. Supp. 2d at 832; *Nichols*, 81 F.3d at 41; *Rachid*, 376 F.3d at 312.

Retaliation claims under the ADA are analyzed similarly to those in Title VII cases. *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 & n.8 (5th Cir. 1998). A claim of unlawful retaliation under the ADA, as under Title VII, requires a plaintiff to make a *prima facie* case by showing that (1) he or she engaged in an activity protected by the ADA, (2) he or she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action. *Seaman v. CSPH*, 179 F.3d at 301, *cited for that proposition in Tabatchnik v. Continental Airlines*, 262 Fed. Appx. 674, 676 (5th Cir. Jan. 30, 2008). In *Burlington N. and Santa Fe Ry. v. White (hereinafter "Burlington N.")*, 548 U.S. 53, 60 (2006), the Supreme Court, concluding that the range of employer actions prohibited by Title VII's anti-retaliation provisions is broader than that covered by its anti-discrimination provisions, held that for retaliation claims, instead of the "ultimate employment decision" standard, an employee suffers an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." If the plaintiff succeeds, the employer must present a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If

-31-

the employer succeeds, the plaintiff must present sufficient evidence showing that the employer's proffered reason is a pretext for discrimination and that but for the protected activity, the adverse action would not have occurred.  *Id*.[15]; *Seaman*, 179 F.3d at 301.   Unlike under Title VII, for a retaliation claim under the ADA there is no requirement that the plaintiff suffer from an actual disability; the plaintiff need only demonstrate that the plaintiff has a reasonable good faith belief that the statute has been violated.  *Tabatchnik*, 262 Fed. Appx. at 676 & n.1 (failure to prove a disability does not preclude the plaintiff from pursing a

---

[15] The Plaintiff's burden of showing a causal link for a *prima facie* case of retaliation is much less stringent than the "but for" causation that a jury must find.  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).  "[T]iming can sometimes be a relevant factor in determining whether a causal connection exists where the timing between a protected act and the adverse employment action is 'suspicious[ly]'proximate."  *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 418 n.9 (5th Cir. 2003).  The Fifth Circuit has explained,

> In *Clark County School District v. Breeden*, the Supreme Court noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality *to establish a prima facie case* uniformly hold that the temporal proximity must be 'very close.'" 532 U.S. 268, 273 . . . (2001)(emphasis added).  *Breeden* makes clear that (1) to be persuasive evidence, temporal proximity must be very close, and importantly (2) temporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation.  *See id.* But we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation.  Such a rule would unnecessarily tie the hands of employers.

*Strong v. Univ. Healthcare Sys., LLC*. 482 F.3d 802, 808 (5th Cir. 2007).

retaliation claim).  Where an employee has a good faith belief that he is disabled or perceived as disabled, making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity.  *Id., citing* 42 U.S.C. § 12112(b)(5)(A) (statute requires "making reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.").

The Fifth Circuit has recognized a cause of action for disability-based harassment as a hostile work environment under the ADA.  *Flowers v. Southern Regional Physician Services, Inc.*, 247 F.3d 229, 232-35 (5th Cir. 2001)("It is evident, after a review of the ADA's language, purpose, and remedial framework, that Congress' intent in enacting the ADA was, *inter alia*, to eradicate disability-based harassment in the workplace."), on subsequent appeal on other grounds, 286 F.3d 798 (5th Cir. 2002).  Modeled after the elements of a similar claim under Title VII, a plaintiff must show

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to  take prompt, remedial action.

*Id.* at 235-36, *citing McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998). The harassment must "'be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.'" *Id.* at 236, *citing id.* To determine if the work environment is abusive, the court should consider "the entirety of the evidence . . . including 'the frequency of the discriminatory conducts, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.'" *Id.*, *citing* TCHRA, Texas Labor Code, § 21.051, et seq. Texas courts have followed the Fifth Circuit precedent with respect to hostile work environment claims under the TCHRA, *LeBlanc v. Lamar State College*, 232 S.W. 2d 294, 303 (Tex. App.--Beaumont 2007).

*TCHRA*

Section 21.051 of the Texas Labor Code prohibits employers from discrimination against employees with regard to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, national origin or age. Based on the fact that "one purpose of chapter 21 of the labor code is to effect the policies of the ADA, the courts look to analogous federal law in reviewing a claim for disability discrimination under Texas law." *Petrillose v. Christus Spohn Health System Corp.*, No. 13-07-00573-CV, 2009 WL 2541510, *6 (Tex. App.--Corpus

Christi Aug. 20, 2009), *citing Thomann v. Lakes Regional MHMR Center*, 162 S.W. 3d 788, 795-96 (Tex. App.--Dallas 2005), *citing Haggar Apparel Co. v. Leal*, 154 S.W. 3d 98, 100 (Tex. 2004).  Thus "Texas courts follow federal precedent for guidance when interpreting chapter 21." *Petrillose*, 2009 WL 2541510, at *6, *citing Davis* v. City of Grapevine, 188 S.W. 3d 748, 757 (Tex. App.--Fort Worth 2006, pet. denied).  Federal courts guide Texas courts in interpreting Chapter 21's definition of disability.  *Little v. Texas Dept. of Criminal Justice*, 148 S.W. 3d 374, 382 (Tex. 2004).

To prevail on a disability discrimination claim under § 21.051, a plaintiff must demonstrate that he (1) has a disability, (2) is qualified for the job, and (3) suffered an adverse employment decision solely because of his disability.  *Davis*, 188 S.W. 3d at 757. Under § 21.105, an employer can only be held liable for "discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job."  Plaintiff has the burden to show that he can reasonably perform, or was otherwise qualified for, his job by demonstrating that he could (1) perform all the essential functions without accommodations or (2) with some reasonable accommodation by his employer.  *Petrillose*, 2009 WL 2542510 at *6, *citing Ketcher v. Wal-Mart Stores, Inc.*, 122 F. Supp. 2d 747, 755 (S.D. Tex. 2000), and *Davis*, 188 S.W. 3d at 758.

Under § 21.055 of the Texas Labor Code,

-35-

> An employer . . . commits an unlawful employment
> practice if the employer . . . retaliates or
> discriminates against a person who, under this chapter:
>
> > (1) opposes a discriminatory practice;
> > (2) makes or files a charge;
> > (3) files a complaint; or
> > (4) testifies, assists or participates in any
> > manner in an investigation, proceeding, or
> > hearing.

Again analogous federal statutes and cases determining them guide Texas courts in interpreting § 21.055 because the purpose of the Texas Commission on Human Rights Act is to provide for the execution of the policies of Title VII. Tex. Labor Code § 21.001(1). *Quantum Chem Corp. v. Toennies*, 47 S.W. 3d 473, 476 (Tex. 2001).

For a *prima facie* case of retaliation under § 21.055, the plaintiff must show that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) there was a causal connection between participation in the protected activity and the adverse employment decisions. *Thomas v. Clayton Williams Energy, Inc.*, 2 S.W. 3d 734, 739 (Tex. App.--Houston [14th Dist.] 1999, no pet.). The burden then shifts to the employer to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* Once, the burden of proof returns to the plaintiff to demonstrate that the employer's proffered reason was a pretext for discrimination and the engaging in the protected activity was the but-for cause of the adverse employment action. *Pineda v. UPS*, 360

-36-

F.3d 483, 485 (5th Cir. 2004); *Quantum*, 47 S.W. 3d at 479.

*Judicial Estoppel and Social Security Disability Benefits*

The common law equitable doctrine of judicial estoppel may be applied by a court when a party attempts to assert, in a judicial or quasi-judicial proceeding, a position contrary to a position taken by that party in a prior judicial or quasi-judicial proceeding. *New Hampshire v. Maine*, 523 U.S. 742, 749 (2002). It is applied to protect the integrity of the judicial process by precluding a party who prevails on one ground in one judicial proceeding from changing that position in a subsequent proceeding, in other words intentionally to "play fast and loose" with the courts to obtain an unfair advantage. *Id*. at 750; *Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc*.), 73 F.3d 595, 598 (5th Cir. 1996); *In re Ark-La-Tex Timber Co*., 482 F.3d 319, 332 (5th Cir. 2007); *Kane v. Nat'l Union Fire Ins. Co*., 535 F.3d 380, 385 (5th Cir. 2008). There are three requirements for the doctrine to apply: (1) the party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent. *Kane*, 535 F.3d at 385-86, *citing Superior Crewboats*, 374 F.3d at 335.

In *Cleveland Policy Management Systems Corp.,* because there was disagreement among the lower courts, the United States Supreme

Court examined the question whether claims for Social Security Disability Insurance Benefits inherently conflict with claims for ADA damages and whether a plaintiff who has applied for and received Social Security benefits should be judicially estopped from suing his or her employer under the ADA.  *Cleveland Policy Management Systems Corp.*, 526 U.S. 795, 797 (1999)[16](whether § 223(a) of the Social Security Act, 42 U.S.C. § 423(d)(2)(A),[17]

---

[16] In *Cleveland*, after the plaintiff suffered a stroke and lost her job, she applied for disability benefits from the SSA on the grounds that she was "disabled" and "unable to work." Subsequently she filed suit against her employer alleging that her termination without an effort to reasonably accommodate her disability was a violation of the ADA. The district court granted summary judgment for the employer on the grounds that the plaintiff had admitted that she was totally disabled by filing for and receiving social security benefits and was therefore judicially estopped from proving an essential element of her ADA claim, i.e., that she was a qualified individual with a disability that could perform the functions of her job with reasonable accommodation. On appeal, the Fifth Circuit affirmed, stating "the application for or receipt of social security disability benefits creates a *rebuttable* presumption that the claimant or recipient of such benefits is judicially estopped from asserting that he is a 'qualified individual with a disability.'" *Cleveland*, 526 U.S. at 800 (emphasis in original).

[17] Section 423(d)(1)(A) defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any . . . . physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Section 423(d)(2)(A) adds,

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments of such severity that he is not only unable to do his previous work, but considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

-38-

"erects a special presumption that would significantly inhibit [a Social Security Disability Insurance ("SSDI")] recipient from simultaneously pursuing an action for disability discrimination under the [ADA], claiming that "with . . . reasonable accommodation" she could perform the essential functions of her job."). It concluded that there should not be a per se ban because they do not "inherently conflict to the point where courts should apply a negative presumption"; "there are many situation in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 803. The high court noted that in light of the differences in the definition of "disability" under the Social Security Act and the definition of "qualified" under the ADA, an individual might be disabled for the purpose of SSDI benefits and still be able to establish that he is "qualified" under the ADA. As a significant example, the Supreme Court noted that, unlike the ADA, the Social Security Administration ("SSA") does not take into account the possibility of "reasonable accommodation" in determining SSDI eligibility. Or the plaintiff's condition might have changed over time, so that a statement about her disability made at the time of her application for SSDI benefits does not reflect her capacities

---

immediate area in which he lives, or whether a specific
job vacancy exists for him, or whether he would be hired
if he applied for work. For purposes of the preceding
sentence (with respect to any individual), "work which
exists in the national economy" means work which exists
in significant numbers either in the region where such
individual lives or in several regions of the country.

at the time of the relevant employment decision. *Cleveland*, 526
U.S. at 802-03, 805-06.   Nevertheless, "in some cases an earlier
SSDI claim may turn out genuinely to conflict with an ADA claim."
*Id.* at 805.   Summary judgment in favor of the defendant is
appropriate when the plaintiff, who bears the burden of
demonstrating that she is a "qualified individual with a
disability," fails to make a sufficient showing on that essential
element.   *Id.* at 805-06.   Thus when an ADA plaintiff's sworn
assertion in an application for disability benefits that she is
unable to work appears to negate the essential element of her ADA
claim that she can perform the essential functions of her job, the
"ADA plaintiff cannot simply ignore the apparent contradiction . .
. . Rather, she must proffer a sufficient explanation." *Id.* at
806.   To preclude summary judgment, that explanation "must be
sufficient to warrant a reasonable juror's concluding that,
assuming the truth of, or the plaintiff's good-faith belief in, the
earlier statement, the plaintiff could nonetheless 'perform the
essential functions of her job,' with or without 'reasonable
accommodation.'" *Id.* at 807. *See also Johnson v. Hoechst Celanese
Corp.*, 127 S.W. 3d 875, 880-82 (Tex. App.--Corpus Christi 2004, no
pet.)(although plaintiff represented in her application for
privately insured long-term disability benefits that she was
"totally disabled and unable to work," she was not estopped from
asserting that she could work with reasonable accommodation but was

discriminated against on the basis of disability because her employer refused her request for accommodation). *See also Giles v. General Electric Co.*, 245 F.3d 474, 483-84 (5th Cir. 2001)[18]; *McClaren v. Morrison Management Specialists, Inc.*, 420 F.3d 457 (5th Cir. 2005).

*Negligence*

To prevail on a negligence claim, a plaintiff must prove (1) the existence of a legal duty, (2) a breach of that duty, and (3) damages that were proximately caused by the breach. *Kroger Co. v. Elwood*, 197 S.W. 3d 793, 794 (Tex. 2006).  In *Gonzales v. Fidelity Distributors Corp.*, No. Civ. A. 3:00cv1197, 2003 WL 21266707, *4 (N.D. Tex. May 30, 2003), the court wrote,

> Generally, the employer-employee relationship creates a duty on the part of the employer to control the employee's conduct. *See Otis Eng'r Corp. v. Clark*, 668 S.W. 2d 307, 309 (Tex. 1983).  An employer also has a duty to adequately hire, train and supervise employees and the negligent performance of those duties may impose liability on an employer if the complainant's injuries are the result of the employer's failure to take

---

[18] In *Giles*, the Fifth Circuit found that allegations in Giles's SSDI application did not operate judicially to estop him from asserting an ADA claim because he failed to obtain the SSDI benefits. *Giles*, 245 F.3d at 483.  Moreover it addressed the question whether statements in Giles's SSDI application (that he had recurrent disk herniation resulting in leg pain and numbness, was unable to walk more than one and a half blocks, had a permanent weight restriction, experienced chronic pain, and could not walk or stand long) undermined the factual assertions required for his ADA claim; the panel determined that Giles's explanation that with reasonable accommodation he believed he could perform the job, defeated summary judgment for the defendant.

reasonable precautions to protect the complainant from misconduct of its employees. An employer, however, cannot be held liable for negligently hiring or retaining an employee unless the employee committed an actionable tort. *See Gonzales v. Willis*, 995 S.W. 2d 729, 738 (Tex. App.-San Antonio 1999, no pet.).

Furthermore, there is an emerging trend in Texas federal courts to dismiss claims of negligent hiring, retention, supervision, and training in connection with alleged employment discrimination claims because the latter are not a common law tort. *Staples v. Caremark, LLC*, No. Civ. A. SA-08-CV-831-XR, 2009 WL 3634079, *5-6 (W.D. Tex. Oct. 29, 2009)("This Court adopts the emerging trend in federal courts in Texas that hold that negligent hiring, retention, supervision and training claims based on a discrimination allegation cannot survive because statutory discrimination claims are not a common law tort."), *citing inter alia Udoewa v. Plus4 Credit Union*, No. H-08-3054, 2009 WL 1856055,(S.D. Tex. June 29, 2009)("To prevail on negligent retention claim, Udoewa must ultimately establish that Stark committed a common-law tort against him."); *Havens v. Victoria of Texas Ltd. Partnership*, No. V-06-119, 2008 WL 1858924 (S.D. Tex. Apr. 24, 2008)("As noted elsewhere in the Fifth Circuit, several Texas and appellate courts and federal district courts have begun to adopt the rule that employers are not liable for the allegedly negligent hiring, training, supervision and retention of an employee unless the employee committed some independent actionable tort."); *Cunningham v. Daybreak Therapy, L.P.*, No. 2:06-cv-289,

2007 WL 2694438 (N.D. Tex. Sept. 17, 2007)(a claim for negligent supervision requires that an employee have committed an actionable tort against the Plaintiff.  Sexual harassment cannot be the basis of a negligent supervision claim because it is not a common law tort.); *John v. Blue Cross/Blue Shield of Texas*, 375 F. Supp. 2d 545 (N.D. Tex. 2005)("[s]everal Texas appellate courts and federal district courts have recently adopted the rule that an employer cannot be held liable for negligently hiring an employee unless the employee committed an actionable tort.").

*Intentional Infliction of Emotional Distress ("IIED")*

     The essential elements of a claim for IIED are that (1) the defendant acted intentionally or  recklessly,; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe.  *Miller v. Raytheon Aircraft Co.*, 229 S.W. 3d 358, 383 (Tex. App.--Houston [1st Dist.] 2007), *citing City of Midland v. O'Bryant*, 18 S.W. 3d 209, 216 (Tex. 2000); *see also Twyman v. Twyman*, 855 S.W. 2d 619, 621-22 (Tex. 1993)(recognizing independent tort of IIED and adopting elements of *Restatement (Second) of Torts* § 46 (1965)).  To be extreme and outrageous, the conduct must be so extreme in degree and so outrageous in character as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly  intolerable in a civilized community.  *Miller, id., citing O'Bryant, id.* at 217.

It is for the court initially to decide whether a defendant's conduct was extreme and outrageous; if it decides that reasonable minds could differ, a jury must decide if the defendant's conduct was sufficiently extreme and outrageous to impose liability. *GTE Southwest, Inc. v. Bruce*, 998 S.W. 2d 605, 616 (Tex. 1999); *Wornick Co. v. Casas*, 856 S.W. 2d 732, 734 (Tex. 1993). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct." *Id*. at 612.

"'[A] claim for intentional infliction of emotional distress does not lie for ordinary employment disputes,'" which might include "criticism, lack of recognition, and low evaluations, which, although unpleasant and sometimes unfair, are ordinarily expected in the work environment." *Miller*, 229 S.W. 3d at 383; *GTE Southwest*, 998 S.W. 2d at 612-13. A termination of employment, even if wrongful, is not legally sufficient evidence that the employer's conduct was extreme and outrageous. *Miller*, 229 S.W. 3d at 383, *citing S.W. Bell Mobile Sys., Inc. v. Franco*, 971 S.W. 2d 52, 54 (Tex. 1998).

Over the last decade or so, the Texas Supreme Court has narrowed the application of IIED under Texas law. In *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W. 2d 62, 63 (Tex. 1998), the Texas high court held "that intentional infliction of emotional distress is not available as an independent cause of action unless

the actor intends to cause severe emotional distress or severe emotional distress is the primary risk created by the actor's reckless conduct." Determining that "[t]here is no liability . . . if the actor 'intends to invade some other legally protected interest,' even if emotional distress results," the Texas Supreme Court further opined that "the tort's clear purpose is to supplement existing forms of recovery by providing a cause of action for egregious conduct 'that its more established neighbors in tort doctrine would technically fence out.' . . . In short, intentional infliction of emotional distress is a 'gap-filler' tort that should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." *Id.* at 67, 68 (in light of the development of the tort, holding that "a claim for intentional infliction of emotional distress cannot be maintained when the risk that emotional distress will result is merely incidental to the commission of some other tort."). Nevertheless, the Texas Supreme Court left room for an IIED claim in the employment context "only in the most unusal circumstances," where the "conduct brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct." *GTE Southwest*, 998 S.W. 2d at 613, *citing Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1376 (5th Cir. 1992)(employee must show conduct "elevating [the employer's] actions above those involved in an 'ordinary

-45-

employment dispute'"), and *Porterfield v. Galen Hosp. Corp.*, 948 S.W. 2d 916, 920-21 (Tex. App.--San Antonio 1997)("Only in the most unusual of employment cases does the conduct move out of the 'realm of an ordinary employment dispute' and into the classification of extreme and outrageous . . . .").

Subsequently in *Hoffman-LaRoche v. Zeltwanger*, 144 S.W. 3d 438 (Tex. 2004), the plaintiff brought a sexual harassment claim under the TCHRA, along with a claim for IIED. The Texas Supreme Court opined that "the tort should not be extended to thwart legislative limitations on statutory claims for mental anguish and punitive damages." *Id.* at 447. Finding that by combining her sexual harassment claim with one for IIED, which the Texas Supreme Court determined was not independent of the sexual harassment claim, the plaintiff improperly circumvented the legislature's determination of the maximum amount a defendant should pay for such conduct in the TCHRA. *Id.* at 447 and 450. "Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Id.* In Zeltwanger's case, because "[t]he gravamen of [her] complaint is the type of wrong that the statutory remedy was meant to cover," the Texas Supreme Court concluded that she could "not maintain an intentional infliction claim regardless of whether . . . she succeeds on, or even makes, a statutory claim." *Id.* at 448.

In *Creditwatch, Inc. v. Jackson*, 157 S.W. 3d 814, 816 (Tex.

-46-

2005), the Texas Supreme Court reiterated that "the intentional infliction of emotional distress is a 'gap filler' tort never intended to supplant or duplicate existing statutory or common-law remedies.  Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill."

Federal courts exercising supplemental jurisdiction over IIED claims while entertaining a discrimination claim under one of the federal statutes, as well as the TCHRA, have dismissed the IIED claim under *Hoffmann-La Roche*.  *See, e.g., Rice v. Kaufman and Broad Home Corp.*, No. 4:08-CV-237-A, 2009 WL 2523737, *4 (N.D. Tex. Aug. 18, 2009)(Title VII, § 1981, and IIED); *Elsik v. Regency Nursing Center Partners of Kingville, Ltd.*, No. V-06-41, 2007 WL 2428288, *7-8 (S.D. Tex. Aug. 22, 2007)(Title VII, § 1981, TCHRA, and IIED); *Willi v. American Airlines, Inc.*, No. 4:05-CV-453-Y, 2007 WL 1650419, *5 (N.D.  Tex. June 7, 2007)(ADA, TCHRA, and IIED); *Gonnering v. Blue Cross & Blue Shield of Texas,*, 420 F. Supp. 2d 660, 665-66 (W.D. Tex. Jan. 27, 2006)(ADA and IIED); and *Swafford v. Bank of America Corp.*, 401 F. Supp. 2d 761, 765 (S.D. Tex. 2005)(ADEA, TCHRA, and IIED).

In Texas, the general rule is that absent a specific agreement otherwise, employment is at-will and may be terminated by the employer or the employee for good cause, bad cause or no cause at all.  *Midland Judicial Dist. Cmty. Supervision & Corrections Dep't v. Jones*, 92 S.W. 3d 486, 487 (Tex. 2002); *Montgomery County Hosp.*

*Dist. v. Brown*, 965 S.W. 2d 501, 502 (Tex. 1998).  Employment-at-will status is presumed.  *Montgomery County*, 965 S.W. 2d at 502.[19] To rebut the presumption, "the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances."  *Id.*

### Defendant's Motion for Summary Judgment (#90)

ANICO contends that it is entitled to summary judgment for the following reasons:  (1) Plaintiff's claims are barred under the doctrine of judicial estoppel because Plaintiff has failed to explain the inconsistency in his claim that he is totally disabled when he applied for social security benefits in contrast to his claim in this action that he is a "qualified individual with a disability" for purposes of the ADA; (2) Plaintiff's state and federal employment discrimination claims fail because he was discharged as part of a reduction-in-force, based solely on his performance as compared with that of co-workers; (3) Plaintiff's hostile work environment and retaliation claims fail because Williamson did not attempt to resolve his problems through ANICO's internal conflict-resolution procedures, he failed to pursue administrative remedies on either claim, and he failed to allege facts, no less provide evidence to support either claim; (4)

---

[19] The Texas Supreme Court has recognized an exception, not applicable here, where an employee is terminated "for the sole reason that the employee refused to perform an illegal act." *Sabine Pilot, Inc. v. Hauck*, 687 S.W. 2d 733, 735 (Tex, 1985).

Plaintiff's Texas common law claims must be dismissed because they
are based on the same facts as the ADA claim and because Plaintiff
failed to satisfy the elements of the state law claims; and (5)
Plaintiff failed to demonstrate pecuniary damages or entitlement to
any other form of relief, and even if he were entitled to an award
of some kind, ANICO is entitled to partial summary judgment because
Plaintiff failed to mitigate his damages and because, while
Williamson was still in its employ, had ANICO known the information
gleaned during discovery in this case, it would have terminated him
immediately.

     With supporting evidence, ANICO points out that after
Plaintiff was discharged on January 31, 2006, he filed timely
grievances with the EEOC (#90, Ex. 1) and with the TWC (*id.*, Ex.
2). In the EEOC Grievance,[20] Plaintiff charged ANICO with violating

---

     [20] Because Plaintiff is *pro se*, the Court examines his
discrimination charges carefully to flesh out Plaintiff's
complaint. After checking the box "disability" to assert the
circumstances of the alleged discrimination, Plaintiff's EEOC
Charge Intake Questionnaire, filled out on July 5, 2006, stated the
following about the action ANICO took against him:

     My position was terminated January 31st 2006. This
     occurred 1-2 months after I had a seizure in the
     corporate organized van pool. The Director of my area
     (Systems Planning and Computing) Don Ciaccio organized
     and drove this van pool daily. I had a seizure and was
     only taken to my "drop off point" where we all stopped to
     get our vehicles. My corporation was (is) well aware of
     every seizure I have had that involved PMS/doctors and
     medication for which I have paid health insurance
     coverage for myself and my 2 children for the past 6-7
     years. The day I was laid-off (terminated) my health
     coverage for all of us ended. My corporation never

the ADA in laying Williamson off and failing to accommodate his
health problems (seizures, intra cranial hemorrhage, or stroke),
while his TWC Grievance[21] stated that he suffered "episodes," never

> offered assistance (help) when it came to my health
> (seizures/intra cranial hemorrhage [*sic*] or stroke that
> occurred 26 months ago. All I was allowed to do since I
> was "on call" 24 hrs. a day was to use my vacation time.
> My boss/managers/VPs never asked how I was or could they
> assist me due to my health, which is quiet [*sic*] ironic
> considering this is an insurance company (who I pay
> health policies for me and my children) whom I have
> worked for the past 6-7 years.

In response to the instruction to identify the basis of the
discriminatory action and why he thought that, Plaintiff wrote,

> This action was based on my disability and expense to my
> employer whom [*sic*] also paid my health coverage
> expenses. Ever[y] review I've had was commendable as
> well as my VP (Julian Antkoviak) stated for the past 3
> years that he wanted me in management. I also
> edited/created/stored millions of policies this
> corporation sells to policy holders. This corporation
> terminated my positions when I've wrote/edited/created
> millions of policies that are still in use today by
> millions of policy holders. As well I changed these
> policies due to the requirements of state commissioners
> that determine what is necessary in insurance policies
> depending upon what is required (necessary) for that
> state. As well once our "data center" moved to South
> Shore my production doubled or tripled which I have paper
> work to prove. I didn't just write policies which is the
> position they terminated. I had many other
> responsibilities that doubled or tripled my
> responsibilities but 1-2 months after a seizure in a
> corporate van pool I am terminated.

[21] In his TWC Charge of Discrimination, filled out on July 14,
2006, after checking box "disability" as the basis of his
discrimination claim, Plaintiff wrote,

> I. In late May 2004, I suffered an episode of a severe
> disabling health condition. This episode required that
> I take an extended leave of absence. I returned to work

using the word "seizure," and that his employer denied him reasonable accommodation and the opportunity to use sick leave. Plaintiff also conceded in the TWC Grievance that his discharge was part of a reduction-in-force.[22]  After an unsuccessful attempt at mediation, the EEOC issued Plaintiff a right-to-sue letter on August 17, 2007.  Plaintiff filed this action on November 6, 2007, and filed his Amended Complaint on November 26, 2008, asserting

---

in September 2004 and our office moved to a new location on or about January 2005.  After the relocation, my duties increased and my productivity tripled.  Some of these additional duties assigned to me include but are not limited to server programming, policy coding, creating office data base program, etc.  Throughout this time I continued to have recurring episodes which required a day or two to recover.  I would use vacation leave for these recovering days because my superior frowned on my use of sick leave.  Consequently, I was denied a reasonable accommodation and denied the opportunity to use sick leave.

II.  The Company was aware of my medical history and every episode which required medical attention.  On or about December 2005 I had an episode in the van pool witnessed by coworkers.  On January 31, 2006, I was laid off.  Prior to my episode, I was being considered for management.  I was also told by Dan Trevino, Assistant Vice President, I was not one of the individuals whom [sic] was going to be laid off.

III.  I am aware that about five other individuals, all over the age of 50, were laid of the same day.  Although my performance was not an issue I believe I was the only individual under 40 to be targeted for lay off.

IV.  I believe I was discriminated against in violation of The Americans with Disabilities Act of 1990.

[22] ANICO's position before the EEOC was that Plaintiff was laid off with eighteen other employees as part of a reduction-in-force. #90, Ex. 3.

under state and federal statutory and common law that ANICO had
terminated his employment because of his "seizures and
impairments."   Pointing out that Plaintiff repeats the phrase,
"seizures and impairments," throughout his pleadings, ANICO
questions what Plaintiff means by "impairments."   Plaintiff has
also alleged in this action claims of hostile work environment and
retaliation, neither of which was alleged in his EEOC or TWC
filings.

      ANICO points to the substantial discussion of its policies
regarding the ADA, reasonable accommodation, hostile work
environment, and harassment in its Management, Technical and
Administrative Handbook (#90, Ex. 7), a copy of which is given to
all ANICO employees, and which Williamson received and for which he
signed an acknowledgment of receipt (*id.*, Ex. 8).[23]   Among the
handbook's contents are chapters on leave, paid sick leave,
grievance procedures, and the ADA.   ANICO points out that Plaintiff
failed to follow the three-step procedure[24] set out in it to pursue

---

[23] The Acknowledgment of Receipt includes the following:

   **Employee's acknowledgment.**   I have received my copy of
   this manual and I understand that it is my responsibility
   to read and comply with the policies contained in this
   handbook and any revisions to it. . . .

[24] First the employee should discuss the accommodation with his
supervisor.  Second, if that is not successful, the employee should
make a written request to the department or operations head.
Third, if the matter is still not resolved, a written request
should be made to the Human Resources Director.  If the matter is
then not concluded, a committee, composed in part of managers from

reasonable accommodation under the ADA.  The handbook also defines a hostile work environment and sets out a multi-step procedure for asserting harassment complaints.  Ex. 7 at 4.  Williamson never took advantage of these procedures.  Lepard Aff.,[25]  Ex. 5; Williamson Dep., Ex. 15 at 347:12-14.  ANICO states that Plaintiff admitted during his deposition that "human resources was an option," but rejected it because the Human Resources department ("HR") had required Williamson to take a first aid training class when he was designated as a floor captain in case of emergencies. #90, Williamson Dep., Ex. 15 at 347:12-349:16.

ANICO represents that after Williamson's rehabilitation program, he returned to work with no restrictions placed on him by his physician in the doctor's release.  #90, Ex. 9.  According to ANICO, Williamson returned to his Programmer Analyst job and was given a period of lighter duty to "ramp up" to speed.  Mendez Aff., Ex. 6 at ¶ 4.  Williamson testified during his deposition that shortly after returning to work, he engaged in activities such as fishing and exercising.  Ex. 15 at 228:4-229:5.  He also joined a co-ed softball team.  *Id.* at 226:10-14.  ANICO contends that

---

outside the employee's work area, is appointed to solve the problem.  The matter is handled with "as much privacy and confidentiality as possible.  The employee may request a co-worker be present at any time.  Retaliation for reporting harassment or seeking disability accommodation is not tolerated.  Ex. 7 at 3-7, 105.

[25] Bruce Lepard was Senior Vice President of Human Resources and ANICO.

Williamson did not tell anyone in his chain of command that he was, or should be considered, disabled, and he did not ask for any particular accommodation or accommodations needed because of any alleged disability. *Id.* at 299:24-303:21.

According to ANICO, in March 2005 Plaintiff's entire workgroup moved from Galveston to the new data center in League City. Mendez Aff., Ex. 6 at ¶ 5. Although initially Williamson rented an apartment within walking distance of the center, in July 2005 he chose to move back to Galveston to live with his girlfriend, but continued working in League City.[26] He joined an employee van pool to get back and forth to work. One of his major complaints arises out of an incident in the van.

ANICO highlights the fact that Williamson never identifies any nexus between the incident in the van pool and ANICO. ANICO maintains that the van pool was arranged by the participants through a firm named Metro, not by ANICO. Lepard Aff., Ex. 5 at ¶ 4 ("Because a number of employees work in League City and live on Galveston Island, employees have organized to form "van pools" for traveling to and from work in League City. These van pool arrangements, although encouraged by ANICO, have no official or business ties with ANICO. Rather, they are set up by the employees through a firm named Metro.").

---

[26] ANICO points out that Williamson deliberately chose a more inconvenient location for his job by moving back to Galveston.

Williamson appears to complain that he suffered a seizure on an after-work trip in the van to Galveston, but that the driver did not immediately or later take him to an emergency room. Nevertheless Williamson testified that he cannot remember what happened during and immediately after the seizure, but only "people helping me out--and to another vehicle." Williamson Dep., Ex. 15, 36:18-40, 39:3-5. Furthermore, insists ANICO, summary judgment evidence disproves Williamson's conclusions and insinuation that the van driver, the passengers, and therefor ANICO did something illegal in not taking him immediately to a hospital. Alvis Aff., Ex. 10 at ¶¶ 4-5. When Williamson suffered the seizure, the driver, Don Ciaccio, pulled over and called Sandy Alvis, Williamson's girlfriend, who lived with Plaintiff. *Id.* at ¶¶ 3-6. Alvis told Ciaccio to make sure Williamson did not hurt himself and that, as Plaintiff's neurologist had instructed her, there was no need to take him to a hospital unless he was choking or having trouble breathing. *Id.* Charleen Smith, one of the van passengers, had had previous experience with seizure and she helped to assure that Williamson did not hurt himself. Smith Aff., Ex. 24 at ¶¶ 5-7. After the seizure, the van proceeded to the Galveston pick-up/drop-off location, and Williamson was picked up by Sandy Alvis. Alvis Aff., Ex. 24 at ¶ 5. He did not go to the hospital emergency room or seek medical attention that evening. *Id.* ANICO insists that any grievances about Plaintiff's treatment on the van or

-55-

accusations that ANICO is somehow liable for mistreatment regarding the van seizure are frivolous.

As for his discharge, ANICO contends that in early 2004 before Williamson's first seizure and again in 2005 after Williamson's hospitalization and brain surgery, SP&C managers were told to plan for downsizing of the department and to evaluate and rank the employees using a number of identified factors.  Mendez Aff., Ex. 6 at ¶ 3 (April 2004 ranking evaluation) and ¶ 8 (June 2005 ranking evaluations).  Those ranking lowest and those performing tasks that could be performed by other employees were candidates for reduction-in-force termination.  *Id.*; Ex. 19 (rankings).  ANICO asserts that both times Williamson ranked the lowest in his group and that his tasks and responsibilities could be assumed by the remaining employees.  *Id.*  ANICO was able to avoid a layoff in 2004, but in 2005 it cut nineteen employees as part of a reduction-in-force and in accordance with those rankings.  Lepard Aff., Ex. 5 at ¶ 6.

After he was terminated, Plaintiff applied to the Social Security Administration ("SSA") for disability benefits. Disability Report, Ex. 23.  He received SSA benefits retroactively, going back to January 31, 2006, the day he was discharged. Williamson Dep., Ex. 15 at 78:4-7.  In response to ANICO's request for admissions, Plaintiff stated that he was physically incapable of satisfactorily performing his Programmer Analyst tasks at ANICO.

Ex. 22, Admission Request No. 53.[27]  He also admitted that he is
permanently disabled and unable to work.  *Id.*, Admission Request
Nos. 54[28] and 58.[29]  After his lay-off, Plaintiff's only attempt to
find work was through a firm named Labor Ready, Inc, and his only
employment was ten days as a general laborer.  *Id.*

ANICO challenges some of Plaintiff's factual allegations with
contrary summary judgment evidence.

For example, although Williamson asserts that he was given
additional responsibilities after returning to work following
surgery and rehabilitation, ANICO insists he was not overburdened.
Williamson identifies only one added task in his deposition (Ex. 15
at 218:12-221:7), he does not explain how that task constituted
harassment, and he cannot show it was discriminatory because all of
his co-workers were also assigned additional work because of the
move from Galveston to League City.  Ex. 6, Mendez Aff. at ¶ 5.

Another example, although Plaintiff contends that ANICO should
have known that he should not have been transferred to League City,
his TWC grievance (Ex. 2) concedes that his whole group was

---

[27]  The Request reads, "At the present time, you are physically
capable of satisfactorily performing all the tasks of the job you
last had at ANICO--DENY"

[28]  Request No. 54 states, "At the present time, due to your
disability, you are unable to work--ADMIT, which can easily be seen
due to the recurring seizures & impairments that the Plaintiff has
continued to suffer for the last 6 years."

[29]  Request No. 58 states, "You are permanently disabled--ADMIT"

transferred and he does not claim that he asked to be excluded from the transfer (Mendez Aff. Ex. 6 at ¶ 5).  When Plaintiff suffered a seizure in the van, as noted, the driver (an off-duty ANICO employee) contacted and followed the directions of Sandy Alvis, who in turn had been instructed by Plaintiff's neurologist as to how to deal with such situations.  Mendez, Alvis, and Smith Affs., #6, #10, and 24.

Furthermore ANICO maintains that Plaintiff's contention that ANICO intentionally inflicted emotional distress by "Human Resources['] intentionally training me to provide first aid to help people stay alive" is "ludicrous on its face."  Williamson Dep. (Ex. 15 at 198-200[30]).  ANICO insists that Williamson fails to show

─────────────

[30] When asked what ANICO intentionally did to him with respect to his health to inflict emotional distress, Plaintiff responded,

> Well, intentionally I was forced to transfer regardless of cranial surgery, regardless of reoccurring seizures and impairments.  I was not allowed to stay that close to where I went to rehab or UTMB near all the doctors, surgeons, therapists.  I went through many therapists throughout the process due to all the therapeutic damage and--or I'm sorry, cranial damage therapy.  I had to transfer.  Intentionally they weren't--they put me in an environment that was more damaging, more responsibilities to the point that seizures in a moving vehicle, which I never had, even while I'm driving my own vehicle when I could have killed somebody . . . .
> Intentionally there was Don Ciaccio who has many negative things to say.  He does this on a daily, weekly basis, harassing, discriminatory negative.  There are many actions.  Pressure from Alec Mendez, my direct supervisor, intentionally putting me through all of the responsibilities, regardless of reoccurring seizures and impairments. . . .
> Human resources intentionally training me to provide

a nexus between his floor captain assignment or the first aid
training and his alleged disability.  *Id.*

In addition, ANICO asserts that Plaintiff fails to provide any
specific examples of verbal harassment except by ANICO employee Don
Ciaccio, whom Williamson, himself, describes as "well known" for
picking on lots of people in the office and as "an equal
opportunity harasser."  Ex. #15 at 407:19-408:11; 389:3.[31]  ANICO
states that at his deposition Williamson was asked a number of
questions to clarify the basis of his hostile work environment
claim, but Williamson failed to describe any incident or
circumstance that supported either a hostile work environment[32] or

---

first aid to help people stay alive.  Trained by the
University of Texas Medical Branch to include Jason
Broussard to become a floor captain to aid employees of
the American National Insurance Company when I myself
have seizures and impairments and cranial surgery.  We
have one floor captain on--in the data center to aid and
evaluate employees of the party.  With an impairment it
would be very challenging, and it's a lot of pressure.
It was intentionally inflicted through the human
resources department of American National Insurance
Company through my supervisor.

Ex. 15A at 198:5-199:16.

[31] The Court notes that Williamson makes clear that Ciaccio did
not discriminate in his abusive conduct--he picked on males,
females, people with different racial backgrounds, those with
disabilities and those without disabilities.  Ex. 15B at 408:1-20.
As noted, he called Ciaccio an "equal opportunity harasser."  Ex.
15, 389:3.

[32] The Court observed that when asked about which employees
created a hostile work environment for him as a result of his
disability, he named Sarah Sparks; Don Ciaccio ("Supervisor during
rehabilitation, not beneficial or helpful during a seizure in a

IIED cause of action.

Plaintiff complains that ANICO improperly accounted for his sick and leave time; nevertheless the evidence reflects that he was never denied health-related time off and that he used both sick and vacation leave and even had some left before his termination. Mendez Aff., Ex. 6 at ¶ 6; Lepard Aff., Ex. 5 at ¶ 7.  Williamson objects that his time off should have been designated sick leave and not vacation, but he never complained to his supervisor or others in the chain of command or to the Human Resources department about it.

ANICO argues that nothing in the complaint or the summary judgment evidence suggests that Plaintiff told Mendez or any one else in his chain of command that he was disabled and needed an accommodation or was being harassed because he was disabled.  The affidavit of Bruce Lepard, head of Human Resources, states,

> Nothing in Jeffrey Williamson's employment file indicated that Mr. Williamson initiated any complaints using the Handbook-specified grievance procedures or by any other

corporate vanpool, harassing, negligence, lack of duty, lack of care at this time."); Alec Mendez ("as direct supervisor he was associated with my employment, being transferred, responsibilities regardless of health, regardless of many things.  He was well-associated with Don Ciaccio.  Being my direct supervisor he was also therefore well-associated to human resources."); Carol Ann Kratz (by "allowing an employee to be transferred from one location to another regardless of health, surgery, reoccuring [*sic*] seizure impairments, training him to provide first aid and evacuation of employees when he himself could not possibly provide such to other employees," although Williamson conceded that she never made any negative comments to him or about him regarding his disability). #15 at 413-16.

means. Specifically, there is no record of any grievances of discrimination or failure of supervisors to provide disability accommodations. My review of Mr. Williamson's sick and leave time records shows that Mr. Williamson did not exhaust his leave in 2005.

Ex, 5, ¶ 8. His supervisor, Alec Mendez, states that he did not perceive Williamson to be disabled. Mendez Aff., Ex. 6 at ¶ 10. He attests that Williamson never went to Mendez seeking accommodation and never used internal ANICO grievance procedures, even though Williamson knew that he was required to do so, in order to explain that he needed a disability-related accommodation. Exs. 7 (ANICO's handbook) and 8 (Williamson's acknowledgment of receipt).

ANICO reiterates the reasons why it is entitled to summary judgment on all claims.

First, ANICO relies on *Pena v. Houston Lighting & Power,* 978 F. Supp. 694, 698 (S.D. Tex. 1997)(holding that application of judicial estoppel by the district court in granting summary judgment for the employer on a plaintiff's disability claims under the ADA and the TCHRA was appropriate because the definition of "totally disabled" on SSDI applications "tracked" the language of "qualified individual with a disability" under the ADA)(*citing Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996),[33] to argue that the doctrine of judicial estoppel applies here to preclude

---

[33] This Court observes that both these cases were decided before the Supreme Court issued *Cleveland v. Policy Management Sys.*, 526 U.S. 795.

Plaintiff from asserting in this legal proceeding a claim under the ADA as a "qualified individual" because it is contrary to the position he took when he applied for SSDI benefits, that he was "totally disabled."   Exs. 13 (Williamson's application for disability insurance stating the he became "unable to work because of my disabling condition on May 23, 2004" and is "still disabled") and 23 (Williamson's Disability Report).   The SSA declared Williamson totally disabled and unable to work, and eligible for social security benefits as of the day he was laid off.   Ex. 13; Williamson's Dep., Ex. 15-A at 78:4-7; Ex. 23.   Williamson does not provide any explanation or evidence to reconcile the conflict between his ADA claim and his earlier claimed total disability. During his deposition he declared, "I still think I could have done my job.   I think I could do it to this day."   Ex. 15 at 284:2-7. Plaintiff refused to answer when he was asked about his dealings with the SSA.   *Id.* at 284:19-297:5.   Just like the employer in *Austin v. Bellsouth*, Civ. A. No. 06-7664, 2008 WL 215565 (E.D. La. Jan 24, 2008), ANICO argues it is entitled to summary judgment because like the *Bellsouth* plaintiff, Williamson has failed to explain the inconsistency in his assertions that he was disabled and unable to work in order to obtain SSDI benefits and his claim that he was qualified to perform his job duties for his ADA claim).

ANICO also argues that because Williamson's state common law claims arise from the same facts that form the grounds for his ADA

claim, his only remedies are those provided by the ADA. *Smith v. Methodist Hospital of Dallas*, No. 3:07cv1230-P, 2008 WL 5336342, *5 (N.D. Tex. Dec. 19, 2008).

As for Plaintiff's claims under the ADA and the TCHRA, his grievances challenge three types of discriminatory conduct: wrongful termination, hostile work environment, and retaliation.

The wrongful termination claim fails under the *McDonnell Douglas* framework because Williamson fails to provide evidence showing that either the cause of his termination, or a motivating factor in deciding to terminate his employment, was his alleged disability. ANICO has demonstrated that the decision to lay off Williamson was part of a reduction in force. Lepard Aff., #5 at ¶ 13. His annual performance evaluations and rankings also establish that his discharge was not motivated by his medical condition. Complaint at ¶¶ 15 and 16; Exs. 16, 17, and 18 (annual performance evaluations); Ex. 19 (rankings). Plaintiff has failed to present any evidence showing a causal connection between his discharge and his disability.

ANICO further asserts that Williamson fails to state a *prima facie* case of discrimination.

First his impairment does not constitute a "disability" as defined by the ADA. ANICO maintains that during the time Plaintiff was in its employment, his seizures did not substantially limit any of his major life activities. Williamson does not argue that ANICO

"regarded" him as disabled; rather he alleges that ANICO did not consider him disabled nor give him special treatment because of his occasional seizures, even though it knew of his medical condition. Williamson does not specify a  major life activity impacted by his medical condition.   Since the complaint mainly alleges "seizures and impairments" in the workplace, the major life activity at issue appears to be work.   Therefore,

> The term "substantially limits" means significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working.

*Washington v. HCA Health Servs. of Texas, Inc.*, 906 F. Supp. 386, 390 (S.D. Tex. 1995)(quoting 29 C.F.R. § 1630.2(30)(ii)).  *See also Webster v. Texas Engineering Serv.*, No. Civ. A. 3:97-CV-2505-L, 1999 WL 261925 (N.D. Tex. 1999), *aff'd*, 204 F.3d 1115 (5th Cir. 1999)(plaintiff with epilepsy and seizures, with restriction on driving for thirty days, did not have an impairment that was a "substantial" limitation on his major life activity of work and failed to establish the first element of his *prima facie* case); *Deas v. Rover West L.P.*, 152 F.3d 471, 476 (5th Cir. 1998)(seizures do not constitute a disability *per se* under the ADA and "declin[ing] to accept the broad proposition every temporary loss of 'awareness,' no matter how brief, necessarily constitutes a substantial limitation of the major life activities of seeing,

-64-

hearing, and speaking,"; "it is axiomatic that a physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA.")(*citing Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995)), *cert. denied*, 527 U.S. 1044 (1999); *Todd v. Academy*, 57 F. Supp. 2d 448 (S.D. Tex. 1999)(plaintiff suffering from epilepsy and weekly seizures has a physical impairment under the ADA but, treated with and largely controlled by medication, his epilepsy did not substantially limit major life activities and thus was not a "disability" under the ADA)(*citing Sutton v. United Airlines, Inc.*, 527 U.S. 471, 486 (1999)("if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-- both positive and negative--must be taken into account when judging whether that person is 'substantially limited' under the Act")[34]). ANICO contends that an individualized analysis of Williamson's impairment results in the same conclusion as that in *Todd*. Nothing in the record indicates that he was unable to perform his job because of his seizures; his evaluations and pay increases reflect satisfactory performance; and there is no entry in his employment record suggesting that he made a request for reasonable accommodations. Complaint at ¶¶ 15-16; Ex. 16-18 (performance

---

[34] This holding in Sutton has been overturned by the ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008), but as noted, the Act went into effect on January 1, 2009 and does not apply retroactively. Thus *Sutton* governs this case.

evaluations).   Indeed, Williamson received similar performance evaluations both before and after his cranial surgery.  Exs. 6, 16-18.  Mendez's affidavit states that he did not consider Williamson to be disabled.  Ex. 6 at ¶ 10.

As the second prong of a *prima facie* case, the parties agree that Williamson was qualified for his position, but evaluations comparing similarly situated employees ranked him in the bottom of his peer group both before and after his May 24, 2004 seizure and surgery.  Mendez Aff., Ex. #6, at ¶ 3 and 8; Ex. 19 (rankings).

Third, according to ANICO, the adverse employment action (termination) occurred because of a RIF at ANICO and it is undisputed that other employees were laid off at the same time. ANICO argues that all the evidence, other than Williamson's subjective belief, establishes that Williamson's medical condition played no part in the decision to lay him off.   In his TWC grievance, Williamson concedes that other employees were laid off at the same time.  Ex. 2.  Even if Williamson had shown he was "disabled" under the statute, Williamson has not and cannot rebut the evidence showing that the true non-discriminatory reason for the lay-off was an RIF.  ANICO maintains that in preparation for the potential 2004 RIF that never happened, it instituted the ranking of employees, before Williamson suffered his first seizure. Ex. 6 at ¶ 3.  In April 2004, before his surgery, Williamson ranked lowest among his peer group.  The second evaluation in 2005, after

Plaintiff's surgery, produced the same result.  Ex. 6 at ¶¶ 3 and 9; Ex. 19.  Williamson does not identify any co-worker that he believes should have been discharged instead of himself. Williamson does not and cannot show that his performance was superior to that of any individual in the group with which he was compared, and therefore he cannot meet his burden to show that he was better qualified than co-workers who were not members of his protected class. *Nicholas v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996)(a genuine issue of material fact exists if the evidence shows that plaintiff was clearly better qualified than the employees who were retained in a RIF).  Moreover, Williamson was an "at will" employee,[35] and therefore his vague suggestion that ANICO had some undefined duty to keep him on is contrary to law.

Finally, in this RIF Williamson fails to make a *prima facie* case because he was not replaced by another employee.  Following his termination, his tasks were reassigned to the remaining employees in his work group.  Mendez Aff., Ex. 6.

In conclusion, ANICO insists that summary judgment should be granted to it on the discriminatory discharge claim.  Williamson was released without restrictions by his physician, he has failed to show he was "disabled" for purposes of the ADA, and, most

---

[35] ANICO's 1999 letter offering employment to Williams makes clear that the offer was for "at will" employment.  Ex. 20.  The Employee Handbook also makes that point in several parts, including the front cover.  Ex. 7.

importantly, ANICO has demonstrated that the reasons for his termination were not motivated even in part by Williamson's medical impairment.

ANICO also argues for summary judgment on Williamson's reasonable accommodations claim because (1) he has failed to show he was "disabled" under the ADA; (2) Williamson never told his supervisor[36] or others with decision-making authority that he had a disability for which he need accommodations[37]; and (3) he never requested any particular accommodations associated with his medical condition except for time off, and he was never denied time off when he asked for it.[38]  "The employee bears the responsibility of initiating the interactive process by providing notice of [his] disability and requesting accommodation for it."  *Taylor v.*

---

[36] Mendez stated that he never considered Williamson disabled and that "Mr Williamson did not indicate that he had trouble doing his work and never indicated he was disabled in any way."  Ex. 6, ¶¶ 10, 6.

[37] During Plaintiff's deposition he was asked, "When you went back to work [after his medical leave] at American National, did you tell anyone that you were disabled?," Plaintiff responded, "I don't believe so."  Ex. 15 at 299:24-25, 300:1.  He also stated that he never asked his physician to notify his employer that he was disabled.  Discovery Response, Ex. 22, Admission Request Nos. 39 and 40.

[38] Noting that Williamson implies that ANICO should have known Plaintiff was disabled because it was his health insurer, ANICO responds that the mere fact of a medical problem does not rise to the level of a disability as defined by the ADA.  Williamson's direct supervisor and primary decision-maker, Alex Mendez, knew about Williamson's initial seizure and his seizure in the van pool, but Mendez never saw the medical insurance records and did not consider Williamson disabled.  Mendez Aff., Ex. 6, ¶¶ 3-7.

*Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

Regarding the required exhaustion of remedies in administrative proceedings for all claims before they can be brought in a suit in district court, ANICO points out that Plaintiff's TWC grievance had only disability checked as the basis of discrimination and the content of the grievance complained of a lack of reasonable accommodation and of the accounting of his sick leave. Ex. 2. The EEOC Notice of Charge of Discrimination listed "disability" as the only "circumstance of alleged discrimination" and the only issues being listed were "layoff" and "accommodation." Therefore, ANICO argues, Plaintiff's claim of hostile work environment is barred for failure to exhaust administrative remedies. *Hill v. Dept. of Veterans Affairs*, No. 08-60532, 2009 WL 348767, *4 (5th Cir. Feb. 12, 2009)("an investigation concerning the existence of a hostile work environment would not 'reasonably be expected to grow out of' . . . allegations of these discrete acts of discrimination"), *citing Gates v. Lyondell Petrochemical Co.*, 227 Fed. Appx. 409, 409 (5th Cir. 2007)(holding that the plaintiff's "hostile environment . . claim [] could not be expected to grow out of her [administrative] discrimination charge when she charged only her employer's discrete acts in terminating and failing to promote her, and made no mention of a hostile work environment").

Even if it were not barred, Williamson cannot show actionable harassment or conditions that resulted in a hostile work

environment.  Looking at the totality of circumstances and focusing on the alleged frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance, one must find that Plaintiff has not met his heavy burden of demonstrating harassment so severe and pervasive that it destroyed his opportunity to succeed in the workplace.  *Hill*, 2009 WL 348767 at *4 , *citing and quoting Turner v. Baylor Richardson Med. Center*, 476 F.3d 337, 347 (5th Cir. 2007); *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 326 (5th Cir. 2004).  Williamson fails to make any allegations, no less provide evidence of, such extreme and outrageous conduct.  His only relevant complaint is about certain offhand statements made by Don Ciaccio, such as that Defendant was "getting rid of Jeffrey," and comments regarding his "seizure in the van, [Williamson] out of control, about embarrassment" and, in the last quarter of 2005, "layoff."  Williamson Dep., Ex. 15, 394:1-3; 396:3-23; 398:1-25; 408:9-11.  Also supporting ANICO's request for summary judgment on the hostile work environment claim is Williams' failure to use the internal grievance procedures set out in the Employee Handbook.  Exs. 7 and 8.

Plaintiff also has no retaliation claim, ANICO urges.  Although the forms for both the EEOC and TWC grievance have boxes to check for retaliatory conduct, Plaintiff did not check retaliation on either.  Thus the  retaliation claim must be

dismissed for failure to exhaust remedies. *Pacheco,* 448 F.3d at 789.  Even if it were not, Plaintiff has not pleaded a single fact on which to base such a claim:  he does not allege any activity protected by Title VII to make a *prima facie* case of retaliation.

As for the common law IIED, it is barred as a matter of law because the same facts are alleged by Plaintiff to support it and the ADA claims, so Plaintiff's only remedies are those available under the ADA. *Gonnering v. Blue Cross & Blue shield of Texas*, 420 F. Supp. 2d 660, 665-66 (W.D. Tex. 2006)(and cases cited therein). ANICO also contends that Williamson cannot raise a genuine issue of fact under any of the three.  IIED, a gap-filler tort, cannot be maintained '[i]f the gravamen of the plaintiff's complaint is the type of wrong that [a] statutory remedy is meant to cover." *Smith v. Methodist Hosp. of Dallas*, No. 3:07cv-1230, 2008 WL 5336342, *5 (N.D. Tex. Dec. 19, 2008)("summary judgment is appropriate on an IIED claim where the IIED claim is based on the same facts as an ADA claim."), *citing Stephenson v. Nokia, Inc.*, No. 3-06-cv-2204-B, 2008 WL 2669492, *8 (N.D. Tex. 2006)(same); *Gonnering v. Blue Cross & Blue Shield of Texas,*, 420 F. Supp. 2d 660, 663 (W.D. Tex. Jan. 27, 2006) (same).  During his deposition, when asked to explain the factual basis for his IIED claim, Plaintiff identified four circumstances:  his forced transfer to League City; Don Ciaccio's many negative statements; that he was given more responsibilities after he returned from his medical leave; and "Human resources

intentionally training me to provide first aid to help people stay alive." Ex. 15 at 197:5-199;18. Such allegations are insufficient to establish a claim for IIED.

Plaintiff's negligence claim ("breach of duty of an employer," and "breach of negligence of an employer"), is barred because the same facts give rise to it as to the ADA claims. The elements of a negligence cause of action are a duty, a breach of that duty and damages proximately caused by the defendant employer's conduct. *Gonzales v. Fidelity Distributors Corp.*, No. Civ. A. 3:00cv1197, 2003 WL 21266707, *4 (N.D. Tex. May 30, 2003)("The employer cannot be held liable for negligently hiring or retaining an employee unless the employee committed an actionable tort."). Williamson fails to allege that any ANICO employee committed an actionable tort against him, nor can he demonstrate a compensable injury from any alleged actionable tort. Therefore ANICO is entitled to summary judgment on Williamson's negligence claims.

Finally, ANICO claims it is entitled to summary judgment on all Plaintiff's claims because he fails to meet his burden of demonstrating that he was harmed or damaged. Williams fails to specify any injunctive relief or monetary damages amount, thus failing to present a genuine fact issue related to this element. Fed. R. Civ. P. 26(a)(1)(A)(iii)(During initial disclosures, a plaintiff must provide to the defendant "a computation of each category of damages claimed by the disclosing party––who must also

make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."). Here, Williamson is still unable to specify any relief sought, despite discovery requests from ANICO. Plaintiff asked for injunctive relief in his complaint, but has failed to specify what he seeks. Dep., #15 at 153:12-159:21.

Second, Plaintiff did not incur monetary damages because he was deemed totally disabled and unable to work by the SSA and began receiving disability benefits as of the date of his termination, January 31, 2006. Exs. 13, 14, 23; Williamson's Dep., Ex. 15 at 78:406. Williamson did not claim the he was denied raises because of his alleged disability. The general rule is that a claimant will not be allowed to recover pay (or damages) during any periods of disability because "the plaintiff could not have worked for defendant or anyone else." *Stephenson v. Nokia*, 2008 WL 2669492, *8 n.8.

Third, his failure to mitigate damages bars claims for monetary damages. *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990)(under section 706(g)("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable"), Title VII claimants have a statutory duty to

minimize damages).  The plaintiff must use reasonable diligence to obtain "substantially equivalent" employment.  *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982).  ANICO insists that Williamson made no effort to obtain substantially equivalent employment with his computer skills.  Williamson Dep., Ex. 15 at 53:2-68:18; 271:73:20.  Therefore summary judgment on the damages issues is appropriate and any monetary recovery should be barred.  *Stephenson v. Nokia*, 2008 WL 2669492, at *8; *Aikens v. Banana Republic, Inc.*, 877 F. Supp. 1031, 1040 (S.D. Tex. 1995)("Because [plaintiff] has not reasonably or diligently sought employment substantially equivalent to her position at [defendant], she has wholly failed to mitigate her damages, thus barring any monetary recovery [front and back pay] in this case.").

Alternatively, argues ANICO, because during discovery it found evidence showing that Williamson would have been terminated had ANICO known that during his employment Williamson fraudulently submitted a medical coverage application and sworn statement that stated that he was married at common law.[39]  Ex. 20.  During his deposition he denied ever having been married and even knowing the meaning of "common law marriage."  Williamson Dep., Ex. 15 at 126:20-128:6.  The fraudulent declaration, if known, would have resulted in his termination.  Lepard Aff., Ex. 5 at ¶ 11.  Where an

---

[39] In his affidavit Bruce Lepard states that Williamson's misrepresentation was made to fraudulently obtain insurance coverage for his putative wife and child.  Ex. 5 at ¶ 11.

employer discovers evidence of wrongdoing by an employee that would have led to the employee's termination on legitimate grounds, front pay should not be available and back pay should be restricted to the time from the date of the unlawful discharge to the date on which the employer discovered the employee's misconduct. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 361 (1995); *Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1109 (5th Cir. 1995).

### Plaintiff's Response (#91, 92, 96)

Plaintiff's response is somewhat unclear, redundant, filled with material that is often legally irrelevant to his claims, and full of unsupported allegations, often reiterating his amended complaint and his deposition.   He repeats many parts of his pleadings, ANICO's briefs, and answers to requests for admission.[40] He asserts a number of times that he "feels he was either denied the normal and necessary retraining and mentored re-orientation to be successful, after his injury, after his rehabilitation, and during his recurring seizures & impairments, out of the negligence of the Defendant, or due to a conspiracy of the Defendant to deny the disabled and recovering Plaintiff due process, or there was a conspiracy to deny Plaintiff Permanent Disability."   He names Mendez, Ciaccio, and Human Resources of Defendant as "likely all

---

[40] Williamson states that he is submitting parts of his deposition that were not included by ANICO, but they are not included in the evidence attached to his response.

complicit."   See for example #91 at 47, citing Ex. W at 4-5.
(Plaintiff has not pleaded a claim of conspiracy, nor does he
submit evidence to support one.)   He identifies a number of
employees of Defendant who knew about his seizure on the seawall,
surgery, and rehabilitation (e.g., Assistant Vice President Daniel
G. Trevino (Ex. O),[41] and 47-year employee Esther E. Sonnier (Ex.
P), and argues for purposes of accommodation that Defendant's
decision-makers knew of his disability.   He represents that he
spoke to Mendez about his disability on multiple occasions and
asked for accommodation and points out that Mendez required him to
use vacation time whenever Plaintiff requested time off because of
seizures or for appointments with neurologists, blood work, tests,
etc.   He asserts and provides evidence (Sonnier's witnessed

---

[41] During an interview of Trevino, who identified himself as
Director of Computing Services and a peer of Mendez, the notarized
transcript reflects that Trevino knew precisely what had happened
to Williamson in May of 2004 and the extent of the injury he
suffered.   He also stated that "the Medical Director, Human
Resources Department, and the management team in the Computing
Division were "*privy*" to Plaintiff's medical status, doctor's
reports, doctor's releases, etc." He was "aware of Doctor's orders
and other information being sent to the Personnel Director's Office
concerning the diagnosis, prognosis, etc." He thought that good
judgment was not used in appointing Williamson to be the floor
captain, required to provide first aid and to evacuate ANICO's
employees at the League City DATA CENTER during "dangerous
circumstances."   He also stated, "I know that Jeff was not allowed
a period during which he could 'get back into the swing' after a
long period of absences and a short period of 're-acclimation.'   I
know there was no remedial training or therapy program."

statement,[42] Ex. P) demonstrating that Ciaccio stated in front of other employees that Defendant was working to "get[] rid of Jeff." He closes his response to the motion for summary judgment with the following statement: "The Defendant whom was, Jeffrey's employer, should be aware of what Jeffrey went through, for not only did Jeffrey have a payroll deduction as a health and life insurance policy/holder throughout his employment, multiple employees to include managers witnessed Jeffrey when he was hospitalized at U.T.M.B., multiple employees to conclude managers witnessed Jeffrey have seizures and/or impairments, to include the Defendant . . . ." Plaintiff also claims that he complained to Assistant Vice President Dan Trevino because "he was at a higher employment level that Don Ciaccio, Alec Mendez, Sarah Sparks, Human Resources Personnel, etc."   Ex. U, Plaintiff's Answer to Defendant's Interrogatory No. 2.

### Court's Decision

Plaintiff's specific complaints, used to support all of his causes of action, in light of his recurring "seizures and

---

[42] Around that time Sonnier represents that she was instructed by Mendez to check Plaintiff's coding for errors, document them and turn them into Mendez.  Only when she heard Ciaccio's remark did she "realize[] fully what was going on."  She further states that in April 2007, after she suffered a series of simple seizures, Ciaccio threatened that "if I did not stop talking with and having anything to do with Dan Trevino or Jeffrey Williamson, I would be the next layoff."

impairments," are ANICO's transfer of him from Galveston to League City, the appointment of Plaintiff as a floor captain to evacuate employees in the event of emergencies with the requirement that he take a first aid course, the failure of ANICO employees to take him immediately to an emergency room when he had a seizure in the van pool, and the denial of his requests for days off, characterized as vacation leave rather than sick leave, for his health-related needs.

Although the Court is not required to sift through the summary judgment evidence to find support for the opposition to a motion for summary judgment,[43] in light of Williamson's *pro se* status and cognitive problems, the Court has reviewed all evidence submitted by both sides and evaluated it carefully with respect to the controlling law and relevancy to Plaintiff's claims. Having done so, the Court concludes that Defendant ANICO's motion for summary judgment should be granted for the following reasons.

First, a number of claims are barred as a matter of law. As noted on pages 13-18 of this opinion and order, on the facts before the Court, as a matter of law, Plaintiff has not and cannot state a claim under 42 U.S.C. § 1981, Title VII, Section 501 of the Rehabilitation Act, and the 2008 Amendments to the ADA.

Also, because as a matter of law, the ADA provides for all the remedies Plaintiff seeks in his allegations of disability

---

[43]    *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d at 458.

discrimination claims, his IIED claim is barred because a Texas common law IIED is "a 'gap filler' tort never intended to supplant or duplicate existing statutory or common-law remedies.  Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill." *Creditwatch, Inc. v. Jackson*, 157 S.W. 3d at 816; *Hoffman-LaRoche v. Zeltwanger*, 144 S.W. 3d at 450*(*"Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available."); *Hoffman-La Rocha, Inc.*, 144 S.W. 3d at 447 ("If the gravamen of a plaintiff's complaint is the type of wrong that [a] statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim.").  Thus summary judgment is appropriate in favor of ANICO on an IIED claim as the IIED claim is based on the same facts as plaintiff's ADA claim.  *Gonnering*, 420 F. Supp. 2d at 663; *Stephenson v. Nokia*, 2008 WL 2669492, at *8.  Moreover, even if the IIED claim were not barred by his failure to exhaust remedies, Plaintiff's allegations regarding the conduct of ANICO's employees, as a matter of law, clearly are not so extreme and outrageous as to go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community, nor sufficient to remove his claims from the realm of an ordinary employment dispute. *Miller v. Raytheon Aircraft Co.*, 229 S.W. 3d at 383, *citing City of*

*Midland v. O'Bryant*, 18 S.W. 3d at 217.

Also barred as a matter of law, given the facts and evidence submitted here, are Plaintiff's allegations of negligence against ANICO. Plaintiff himself never identifies an established duty owed to him by his at-will employer.[44]  *See, e.g.*, Williamson's Dep., #90, Ex. 15 at 423-25. If he is bringing a claim for negligent hiring, retention, supervision and training, the negligence claim fails because Plaintiff has failed to allege, no less demonstrate, that ANICO's employees committed an independent, actionable common law tort against him. Nor has Plaintiff  presented any summary judgment establishing that ANICO was negligent in training or supervising its employees.

Second, regarding Defendant's argument that Plaintiff failed to exhaust his remedies, the Court agrees that the EEOC charge and TWC grievance limit Plaintiff's viable claims to discrimination based on disability. Plaintiff's failure to allege hostile work

---

[44] When questioned during his deposition about what duties he believed ANICO owed to him, he was evasive and very general. *See, e.g.*, #90, Ex. 15 at 419-21. He talked about a "lack of care concerning what I suffered, what I went through, that I continue to suffer to this day," and that ANICO should have provided "[a]ccommodations, better care, a little more supportive of an employee of theirs with cranial surgery, reoccuring seizures and impairments even witnessed by individuals." *Id.*, at 419:14-22. When pressed to be specific, he repeated the litany of complaints that appear to support all of his causes of action, e.g., someone should have gotten him emergency care when he was having the seizure in the van pool, he should not have been transferred, he should not have been trained to provide first aid to employees of ANICO or to evacuate them in light of his medical problems, etc. *Id.* at 421.

environment[45] and retaliation in his grievances bars those claims. *Hill v. Dept. of Veterans Affairs*, 2009 WL 348767, at *4 ("an investigation concerning the existence of a hostile work environment would not 'reasonably be expected to grow out of' . . . allegations of these discrete acts of discrimination"), *citing Gates v. Lyondell Petrochemical Co.*, 227 Fed. Appx. at 409 (holding that the plaintiff's "hostile environment . . . claim [] could not be expected to grow out of her [administrative] discrimination charge when she charged only her employer's discrete acts in terminating and failing to promote her, and made no mention of a hostile work environment"); *Gupta v. EAst Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981)(A plaintiff must exhaust his administrative remedies prior to filing a retaliation claim, unless the "retaliation claim arise[s] after the filing of the EEOC charge."). Not only did Williamson fail to allege retaliation in these charges with the administrative agencies, but he never identifies for what protected activity Defendant purportedly retaliated against him. *See, e.g.,* Ex. 15 at 422:3-423:13. He has no proof other than his own vague testimony that he requested a reasonable accommodation for his disability and never specifies

---

[45] Even if he had exhausted remedies on this claim, the facts alleged do not arise to the level of a hostile work environment, with harassment "so pervasive or severe to alter the conditions of employment and create an abusive working environment." *McConathy*, 131 F.3d at 563.

what he thinks would be a reasonable accommodation,[46] other than time off from work to recover from seizures or receive medical treatment, which he was allowed; although he objects that he was required by Mendez to use vacation time for these health-related absences, the record shows he was given time off and still had some leave days remaining when he was laid off.  Although during his deposition he stated that there were times when his request was denied,[47] he has no evidence to support that allegation.  He could not identify dates nor clearly state whether these times off were booked as vacation time (rather than sick time) or just denied. Nevertheless, assuming the Court were to find that Plaintiff did have a physical and/or mental impairment that substantially limits one or more of his major life activities, because the parties agree that Plaintiff was otherwise qualified for his job despite his

---

[46] ANICO maintains he was given all requested time off, regardless of whether it was characterized as vacation time or sick leave, and presents evidence documenting his days off.  As for Plaintiff's objection to his transfer to League City, Defendant has shown that it transferred his entire department to League City.  A defendant is not required to make requested accommodations that impose "an undue hardship on its program's operation; it is only required to make a reasonable accommodation."  28 C.F.R. § 41.53. The ADA defines undue hardship as one requiring significant difficulties or expense when considered in light of a number of factors . . . ." *Powell v. Nat'l Bd. of Medial Examiners*, 364 F.3d 79, 88 (2d Cir. 2004), *corrected on other grounds*, 511 F.3d 238 (2004).  The Court does not address this claim on the merits.

[47] *See, e.g.,* #90, Ex. 15 at 327:16-25; at 328:20-329:19.  Even then Plaintiff was not clear whether Mendez denied his request for health-related time off or he told Plaintiff that he had to book it as vacation time, not sick time.  *Id.* at 329:16-24; 334:1-343:8.

-82-

alleged disability and without accommodation, the Court does not need to reach the reasonable accommodation issue.[48]  Even if it had, Plaintiff fails to make a *prima facie* case of retaliation because he fails to demonstrate a causal connection between his request for sick time off and his termination.  Even if he had, he has not shown that Defendant's reduction-in-force, articulated as the reason for Plaintiff's discharge and supported with documentation relating to preparatory rankings of employees in April 2004 and June 2005, was pretextual.  #90, Mendez Aff., Ex. 6 at ¶¶ 3,8; Ex. 19 (rankings); Lepard Aff., Ex. 5 at ¶6.

With regard to the doctrine of judicial estoppel and the seeming contradiction between Plaintiff's application for a receipt

---

[48] Plaintiff's burden to show that he was otherwise qualified is a two-step analysis.  First he must show that he can perform the essential functions of his job.  Second, only if the Court finds that he is unable to do so, must it determine whether Plaintiff has shown that Defendant could have made a reasonable accommodation to enable him to perform the essential functions of his job.  *School Board of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 n.17 (1987); *Chiari v. City of League City*, 920 F.2d 311, 315(5th Cir. 1991). The same is true under the ADA: "If the defendants' evidence established that 'the plaintiff is not qualified for the position . . . the plaintiff would have to show that (1) she could perform the job's essential functions despite her disability or (2) she could perform the job's essential functions if she received a reasonable accommodation for her disability." *LeBlanc v. Lamar State College*, 232 S.W. 3d 294, 300 (Tex. App.--Beaumont 2007).

Even if an employee failed to show he was otherwise qualified, a defendant "is not required to offer an accommodation that imposes an undue hardship on its program's operation; it is only required to make a reasonable accommodation." 28 C.F.R. § 41.53.  The ADA defines undue hardship as one requiring significant difficulties or expense when considered in light of a number of factors . . . ." *Powell v. Nat'l Bd. of Medial Examiners*, 364 F.3d 79, 88 (2d Cir. 2004), *corrected on other grounds*, 511 F.3d 238 (2004).

of Social Security Disability Benefits on the grounds that he is unable to work and his ADA claim that he can perform the essential functions of her job, Plaintiff has failed to meet his burden to provide a sufficient explanation for the apparent contradiction, sufficient to warrant a reasonable juror's conclusion that he could perform the essential functions of his job with or without reasonable accommodation. *Cleveland*, 526 U.S. at 805-07.   Thus Defendant is entitled to summary judgment on its claim that judicial estoppel should bar his ADA claim against ANICO.

Even if he had provided a sufficient explanation, for a *prima facie* case under both the ADA and the THRCA, Plaintiff must show that he has a "disability."   As noted, after Williamson's rehabilitation program, he returned to work with no restrictions placed on him by his physician in his doctor's release. #90, Ex. 9.  He was able to participate in major life activities such as exercising, fishing and softball.  Plaintiff has shown that he has an episodic physical impairment, i.e., seizures, which may be severe at the time of occurrence, since he shows that during two he lost control of his body and lacked awareness of what was going on around him.  He has not shown how often his seizures occur or how long they usually last and whether he has ever required hospitalization after the first one in May 2004.  He fails to identify, no less present evidence supporting, a substantial limitation of a major life activity.  If the major life activity is

working, both sides agree, and Plaintiff's job evaluations support,
the assertion that he was qualified for and performed his job,
apparently without any accommodations, or with one if the health-
related leave given to him is counted as an accommodation.  His
work did not require heavy lifting, strenuous physical activity or
even driving.  Plaintiff has not met his burden to show he has a
disability for a *prima facie* case of discrimination under the ADA
and the TCHRA.

Because Plaintiff has failed to demonstrate that he has a
claim under any of his causes of action, the Court does not reach
the damages issues.

Accordingly, for the reasons indicated above, the Court

ORDERS that Defendant's motion for summary judgment is
GRANTED.  The Court further

ORDERS that Defendant's motion to dismiss and for more
definite statement (#67) is MOOT.

**SIGNED** at Houston, Texas, this $\underline{2^{nd}}$ day of March, 2010.

                _____

                     MELINDA HARMON
              UNITED STATES DISTRICT JUDGE